EDWIN M. STANTON, Individually and as a Stockholder of LOEW'S INCORPORATED, Suing on His Own Behalf and in Behalf of All Other Stockholders of LOEW'S INCORPORATED, Similarly Situated, Plaintiff, and FRED WARREN, Intervening Plaintiff, *v.* NICHOLAS M. SCHENCK and Others, Defendants.

Supreme Court, New York County, June 25, 1931.

*House, Holthusen & McCloskey* [*Victor House, Carl S. Stern, George V. A. McCloskey, Lewis Pinkussohn, Henry F. Holthusen, Ruth Ivins Wilson* and *Ruth R. Kessler* of counsel], for the plaintiff.

· *Englehard, Pollack, Pitcher & Stern* [*Victor House, Carl S. Stern, George V. A. McCloskey, Lewis Pinkussohn, Henry F. Holthusen, Ruth Ivins Wilson* and *Ruth R. Kessler* of counsel], for the intervening plaintiff.

*Cadwalader, Wickersham & Taft* [*Henry W. Taft, Nathan Burkan, G. Forrest Butterworth, Jr.,* and *Edward Abbe Niles* of counsel], for the individual defendants.

*Leopold Friedman* [*Leopold Friedman* and *Isidore Frey* of counsel], for the defendant Loew's Incorporated.

COTILLO, J. This action was brought by a stockholder in his representative capacity against the officers and directors of Loew's Incorporated, to compel defendants, directors of the corporation, to account to the latter for profits received by them in breach of their official duty. In this action another stockholder has intervened. At the opening of the trial a motion was made on behalf of the defendants to dismiss the complaint for insufficiency. The motion was denied by me with an opinion (N. Y. L. J., April 21, 1931). The trial then proceeded with plaintiffs introducing their proof. At the close of the case defendants, without introducing any evidence, renewed their motion to dismiss the complaint on the ground that plaintiffs had failed to prove a cause of action. Decision upon this motion having been reserved, defendants rested. The cause must, therefore, be decided upon plaintiffs' proof, most of which comes from the mouths of hostile witnesses. The facts as adduced at the trial are as follows:

Loew's Incorporated was organized under the laws of the State of Delaware in 1919 by the late Marcus Loew, to take over the business of Loew's Theatrical Enterprises, a New York corporation. It is an outgrowth of the phenomenal success that has attached to the name " Loew " in theatrical enterprises. Up to his death on September 5, 1927, Loew was president and a director of Loew's Incorporated, the capital stock of which consisted of 4,000,000 shares of common stock without par value, of which 1,341,946$\frac{7}{8}$ shares with voting power were issued and outstanding as of October 25, 1929. Besides these shares there were 227,778$\frac{1}{8}$ non-voting shares held by the National City Bank as trustee against the exercise of outstanding warrants. The corporation was also authorized to issue 300,000 shares of cumulative preferred stock callable at $105 a share. Of these 150,000 shares were issued and outstanding. The preferred stock and the voting common stock had equal voting rights.

Loew's Incorporated, through subsidiary and affiliated companies, owns, leases, operates and controls the management of a large chain of motion picture and vaudeville theatres throughout the United States and foreign countries, including some sixty-seven theatres located in the city of New York. The subsidiary companies also control the production, distribution and exhibition of

motion pictures advertised as Metro-Goldwyn-Mayer productions. The Fox Theatres Corporation and its affiliated companies, including the Fox Film Corporation presided over by William Fox, were the most powerful competitors of Loew's Incorporated in the production, distribution, exhibition and other phases of the motion picture industry. Marcus Loew died on September 5, 1927, and upon his death Nicholas M. Schenck, one of the individual defendants in this action, who had been vice-president of the corporation, as well as a director, became the president. David Bernstein, another director of the corporation, became vice-president and treasurer, and Arthur Loew, a son of Marcus Loew, became a director and vice-president.

At the time of his death Mr. Loew, his wife and their two sons, David and Arthur, owned 150,548 shares of the common stock of Loew's Incorporated, and their holdings were increased by a stock dividend of twenty-five per cent in June, 1928, to 188,185 shares. These shares were held by the Empire Corporation, which was the holding company of the Loew family. Two children of Arthur Loew each owned 4,000 shares at the time of the death of Marcus Loew. Their holdings were increased by the stock dividend to 10,000 shares. In addition, there was acquired for them up to and including October 10, 1928, a sufficient number of shares to make their total holdings 43,900. Arthur Loew himself held 500 shares acquired by him in 1919, and Mrs. Loew held 563 additional shares and David Loew held 565 shares. The total holdings, therefore, of Mrs. Loew and her descendants were 233,713 shares, all acquired prior to October, 1928. Neither the Empire Corporation nor any member of the Loew family, except Arthur Loew, made any purchase of stock after October, 1928. Arthur Loew acquired an interest in 11,581 shares of stock as the result of a pool between himself, Bernstein and Schenck. The latter two owned approximately 50,000 shares of the Loew's Incorporated stock. During February, 1929, the corporation had approximately 6,000 common stockholders and 3,500 preferred stockholders, and its stock was listed on the New York Stock Exchange. The highest price reached by the common stock in the open market in the year 1928 was $77 a share and in the year 1929, $84.50 a share, and for a considerable period during 1929 it was selling on the open market at prices ranging between $50 and $60 a share.

Some time prior to February, 1929, Schenck was approached by one Blumenthal, who requested him to sound out Mrs. Loew as to her willingness to part with her stock. It should be borne in mind at this time that Schenck and Bernstein had been closely affiliated not only with Loew's Incorporated but with the Marcus

Loew family, and had assisted in founding and advancing the Loew theatrical enterprises. This relationship of Bernstein and Schenck with the Loew family is important in view of plaintiff's charges. In accordance with the request made by Blumenthal, Schenck broached the subject to Mrs. Loew, who informed him of her willingness to sell her stock on condition that the purchaser acquire an aggregate of around 400,000 shares, which would include not only her own shares and those of her grandchildren, but the shares of stock owned by Schenck, Bernstein, Arthur Loew and various other directors, employees and associates, specifying those whom she believed to have been closely associated and affiliated with her husband in the building up of Loew's Incorporated. She further inserted a proviso that the purchaser would have to pay $125 a share, $102.50 of which would go toward payment of the owners of the stock and the balance of which would be divided between Schenck, Bernstein and her son Arthur in the form of a bonus for their work with Marcus Loew. To this arrangement Fox, after considerable deliberation at various conferences, agreed; whereupon accumulation of the 400,000 shares was undertaken by Schenck, Bernstein and Arthur Loew, Schenck in the meantime buying for himself, Bernstein and Arthur Loew some additional shares of Loew's stock in the open market. The shares of stock were transferred to Fox, resulting in a profit to Schenck, Bernstein and Arthur Loew of approximately $9,200,000.

The plaintiffs' claim to recover in this action is based upon an alleged breach of the fiduciary relation between the individual defendants as officers and directors and the corporation itself and its stockholders. The claim is made that Fox, acting on behalf of the Fox enterprises, conceived the design of acquiring a dominant position in the management and affairs of Loew's Incorporated and of not only eliminating the defendant Loew's Incorporated as a competitor of the Fox interests, but of reducing it to the status of a subsidiary and placing Fox in a position to take over the assets and profits of the defendant Loew's Incorporated, and of using or controlling the said Loew's Incorporated to strengthen the position of Fox in the motion picture industry; and that Fox and his associates designed among other things to secure management and control of the vast capital invested in, and income accruing from, the operations of the defendant Loew's Incorporated, and looked to the practical acquisition by the Fox enterprises of the good will of the business of the defendant corporation. In order to further this design, Fox, representing the Fox industries, is said to have caused Blumenthal to approach the individual defendants Schenck, Bernstein and Loew and to enter into an understanding with them

whereby the individual defendants, after notice of the purpose and designs of Fox and his associates, agreed to accumulate 400,000 shares of the stock of Loew's Incorporated for transfer to the Fox Theatres Corporation at $125 a share, it being the understanding of the parties that the said block of 400,000 shares would include all the stock of the defendant Loew's Incorporated held by those controlling the management of the defendant Loew's Incorporated.

The plaintiffs further claim, and it is admitted by the defendants, that in accumulating these shares they did not act on behalf of defendant Loew's Incorporated or on behalf of the stockholders of Loew's Incorporated. The shares so accumulated and turned over to Fox were secured for themselves as directors of the defendant Loew's Incorporated from stockholders selected by themselves and by operations in the open market, and the stock, other than that which they acquired in the open market, was obtained from the sellers at an agreed price of $102.50 a share. On February 26, 27 and 28, 1929, this block of stock was transferred by the individual defendants to Fox and his associates in the name of the Fox Theatres Corporation. This block of 400,000 shares was said to constitute practical control of the defendant Loew's Incorporated.

In causing this block of 400,000 shares to be transferred to the Fox Theatres Corporation, plaintiffs further claim that the individual defendants, in divesting themselves and their associates and kinsmen of all stock interest in the defendant Loew's Incorporated, nevertheless retained for themselves employment by the defendant corporation and the lucrative positions which they had held prior to the stock transfer, and the continuance of their positions was dependent upon the good will of the persons controlling the Fox Corporation as the dominant stockholder of Loew's Incorporated; and that by virtue of the said sale they rendered themselves subservient to a competitor of their corporation and amenable to the direction of such competitor by virtue of the very agreement between said William Fox and the individual defendants that they should retain their positions as officers, directors and members of the executive committee of the board of directors of the defendant corporation. Thus, it is asserted, they in fact became the agents and tools of William Fox and his associates in the operation of the business of the defendant corporation.

The plaintiffs further assert that the individual defendants by their deal with William Fox foreclosed themselves from unbiased consideration of other opportunities to effect community of interest arrangements between the defendant Loew's Incorporated and other persons or corporations upon bases more favorable to the

defendant Loew's Incorporated, and also from a consideration of the sale of unissued stock of the defendant Loew's Incorporated, whereby the treasury of the defendant Loew's Incorporated might have been enriched. In making this agreement with Fox and in arranging for the transfer of stock, it is charged that the individual defendants, acting purely from motives of self interest and in violation of their duties as directors, received a secret profit and were guilty of a breach of trust.

The plaintiffs' claim to recover, apart from the general debatable principle as to the right of the corporation to compel a director to account for any profit he might make by reason of his position, irrespective of injury to the corporation, may be said to rest specifically on five propositions:

(1) The alleged conspiracy on the part of the individual defendants and Fox to acquire for the Fox enterprises a controlling interest in Loew's Incorporated.

(2) The alleged conspiracy on the part of the individual defendants to secure a secret profit at the expense of the corporation and its stockholders.

(3) The alleged conspiracy to practically wreck the defendant corporation and make it subservient to the Fox interests.

(4) The alleged conspiracy to turn over the good will and assets of the Loew Corporation to the Fox interests.

(5) The reduction of the individual defendants to the status of vassals and dummies for Fox, thus preventing them from exercising their best efforts and talents in behalf of the corporation, as officers and directors.

In attempting to prove their case, plaintiffs, as I have indicated, were compelled to resort to the testimony of hostile witnesses. But as defendants offered no rebuttal, the testimony elicited from these witnesses must be received in a light most favorable to plaintiffs. On the other hand, much of the testimony related to the negotiations of the defendants and others with Mrs. Loew, the owner of the bulk of the stock. Their testimony as to what Mrs. Loew said cannot be disregarded, in view of the fact that plaintiffs had the opportunity to call her but failed to do so.

Taking up the five propositions in the order named above, let us scrutinize the record.

The testimony of Blumenthal, the broker, who seems to have played a leading part in the transfer of Loew's stock, indicates that the idea of the sale originated in his mind. To quote him: "I said that I had analyzed Mrs. Loew's situation in my own mind and I felt that she held enormous holdings in one corporation which on account of the nature of the business might become

infinitely more valuable or might become much less valuable, and I thought in view of the fact that she had all of her investment in practically one corporation, and that the ambition of Mr. Loew was not now in the way of running the company, she might be willing to sell these holdings. * * * I knew that Mr. Schenck had enjoyed the confidence of Marcus Loew and his family for a great number of years and I also felt that on account of the age of Mrs. Loew's sons and possibly their inexperience, that she would be guided entirely by what Mr. Schenck might advise her to do with reference to selling these holdings, and I thought that he would be the best man I knew to approach her. I was satisfied if I had approached her direct, she would have taken it up with Mr. Schenck anyway." Thus originated the negotiations as a mere attempt by Blumenthal in his role of a broker to earn a commission. So far none of the elements of a conspiracy exist. Throughout his testimony it appears that after Blumenthal's first meeting with Schenck, the latter was not anxious to go on with the negotiations, and in fact was indifferent to the entire transaction. Schenck agreed to see Mrs. Loew. His testimony indicates a desire on the part of Mrs. Loew to recompense Schenck and some others in the corporation for their loyalty and devotion to Loew and Loew's Incorporated. After Schenck and Mrs. Loew decided upon the terms of the proposed sale, he firmly adhered to these terms. Blumenthal then carried the terms to Fox, and suggested to him that he buy the stock. Blumenthal had not discussed the sale with Fox until after his conference with Schenck. Fox did not seem to be enthusiastic at first, but seems later to have reconsidered, and although he deemed the terms harsh, agreed to and did make the purchase. Fox's testimony substantiated both Blumenthal and Schenck in that respect. This testimony undoubtedly disposes of any claim of conspiracy on the part of the defendants to deliver control to Fox. It was, according to the uncontradicted testimony, a mere purchase and sale of stock. Mrs. Loew had an inalienable right to sell her own stock upon any terms she demanded and could obtain. She could impose upon the buyer as one of the conditions that he purchase the stock of her friends and the business associates of her husband. She could fix the price and she was also entitled to do whatever she desired with the proceeds. Plaintiffs have failed to successfully sustain the burden of proof as to this charge.

The second claim of conspiracy is covered in the testimony of Fox, Schenck and Blumenthal. These three witnesses testified that Mrs. Loew made one of the conditions of the sale that the block of 400,000 shares was to be sold at $125 a share, that the

sellers were to receive $102.50 a share and that the difference was to be put into a fund to be divided among the individual defendants. This she insisted upon being done in order to compensate them for past services. There was nothing unlawful or wrong about this. It surely cannot be said that this transaction was a conspiracy to earn a secret profit at the expense of the corporation. Upon this charge the plaintiffs have also failed.

Propositions 3 and 4 may be considered as one. The evidence as to these not only fails to sustain the plaintiffs' contention but rather proves that after the sale of stock to Fox the affairs of the corporation increased in both value and volume. There was no proof of any character showing a depreciation or diminution of the assets of Loew's Incorporated. Whereas, in the years preceding the sale, the net earnings of the corporation reached their highest in 1928, the year preceding the sale, a figure of $8,568,162.12, in the year 1929, the year of the sale, they jumped to $12,167,026.17, and in 1930, the year after, they were $14,942,017.21. This hardly indicates a wrecking of the corporation or the turning of its assets over to a rival. The quotation of $96.75 a share for the stock in 1930 is another signpost indicating the failure of plaintiffs' proof.

The last claim, that is, that the individual defendants reduced themselves to the status of vassals and dummies for Fox, and prevented themselves from exercising their best efforts and talents in behalf of the Loew's Incorporated, needs no extended comment. The subsequent financial success of the company, which concededly was accomplished through the efforts of the individual defendants, sufficiently disposes of this claim.

The evidence shows that there was no change in the policy or the method of conducting the business of Loew's Incorporated subsequent to the sale. The only change at all that took place was that at the annual meeting held in November, 1929, two directors representing the Fox interests were elected to the board of directors of Loew's Incorporated. Under sections 2 and 8 of article I of the by-laws directors of Loew's Incorporated are chosen by cumulative voting and the Fox enterprises, which in November of 1929 owned somewhat over forty-five per cent of the stock of Loew's, could have elected five of the twelve directors.

Essentially the sole proposition in this case is whether or not a person who, because of his position as an officer and director of a corporation is enabled to sell his shares of stock at a much larger price than the stock would bring in the open market, is bound to turn that profit back into the treasury of the corporation; for if the plaintiff should succeed in this action, the only judgment that could possibly be rendered would be to decree an accounting to

the corporation of the profits made by the individual defendants. There is no doubt in my mind that the information that these individuals received, whereby they were enabled to make this profit, did not come to them by reason of their positions in the company, or from any information they received in the handling of the affairs of the corporation. It is the testimony in this case of the witnesses produced by the plaintiffs, which testimony is unimpeached and not in itself inherently improbable, that the offer was made to Schenck not for the purpose of securing the sale of his stock, but for the purpose of having him, on account of his close acquaintance with Mrs. Loew and the Loew family, induce Mrs. Loew to sell her shares of stock to Fox. There is nothing inherently improbable in the proposition that a woman, the widow of the builder of such a vast enterprise, should no longer desire to keep her entire fortune mingled with a corporation which, although organized by her husband, was no longer under his supervision. Neither is it improbable that Mrs. Loew in disposing of her entire interest in the Loew corporation should seek to secure the same profit that she was going to obtain on her stock for the intimates of her deceased husband. As stated above, a great deal of comment and insistence has developed in this case on the subject of the fiduciary relationship existing between officers of a corporation and its stockholders, but I cannot see that this principle affects a situation of one who became an officer of a corporation to divest him of his rights guaranteed under the common law and the statutes, to dispose of his personal assets in any way he sees fit, as long as it is not done with any fraudulent intent or in violation of his duty to the corporation.

Although equity frequently grants relief, where none may be obtained at law, nevertheless, a court of equity will hesitate before it will adopt an innovation which may tend to undermine the entire foundation and structure of corporate existence. A judgment in this case decreeing that the individual defendants should, in the absence of special circumstances, account for the profit realized on their shares of stock would bar the best business minds of the country from accepting either directorships or positions as officers in corporations, because by doing so their hands would be forever tied. The mere fact that a man accepts the position of a director or an official in a corporation should not as a rule deprive him of his right to dispose of his stock as he sees fit and to make any profit that he might gain, provided in the sale of that stock he has done nothing to injure the corporation and its stockholders. The uncontradicted testimony in this case shows that the corporation was not injured; that the corporation lost nothing by

this transfer of stock, and that the stockholders individually and collectively lost nothing, except perhaps the opportunity to participate in the pool. In fact, in considering the earnings of the corporation prior to the transfer of the stock and subsequent thereto, the deal itself seems to have been of great advantage to the corporation. Its profits increased; there was no diminution in the assets of the corporation; the policies inaugurated by Loew were not changed, and it is hard to understand what cause of complaint can possibly be made against these individual directors by the corporation.

In my previous opinion I alluded to the case of *McClure* v. *Law* (161 N. Y. 78), in which it was held that the directors were accountable to the corporation for any gain which they received in turning over the full control of it to third persons. A reading of the opinion in the case in the Appellate Division (20 App. Div. 459), where the facts are more fully stated than in the opinion of the highest court, reveals a situation strikingly dissimilar from the present one. The corporation, the control of which was turned over, was a life insurance company organized upon the co-operative or assessment plan. For $15,000, which the intermediate court characterized as a bribe, the directors turned over their trust to a reckless adventurer, who within a few months converted a flourishing and fully solvent business into a bankrupt concern. The facts justified a claim against the directors for misfeasance. Instead, the receiver waived the tort and brought an action as for moneys had and received.

Assuming, however, that plaintiffs are right in complaining that the directors were not warranted in retaining a position of subservience to Fox, does that fact, in the absence of a showing that the corporation was damaged, justify an accounting for waste? Nothing appears to indicate that subsequent to the sale, the directors and officers in any fashion subverted the interests of the corporation. This fact in itself would negative the claim that the retaining of their positions by the directors was pursuant to a corrupt agreement with Fox. On that basis alone the directors would have nothing to account for to the corporation, unless it might be to explain away a possible charge of a dual allegiance. But even if such dual allegiance were proved, the only consequence which could be visited upon them would be their removal from office, and not an enforcible demand that they turn over to the corporation the profit which they made by the sale of their stock.

We now come to the second feature noted in my previous opinion as a basis for an accounting — the failure of the directors to afford the corporation the opportunity to dispose of its unissued stock

in place of their personal holdings. At the outset a distinction must be drawn between the motive and purpose which impel an individual to sell his stock and those which control a corporation to dispose of its unissued stock. An individual after disposing of his holdings, has no longer any financial interest in the concern. The corporation, on the other hand, in issuing new stock not only retains its old responsibilities, but assumes new ones toward the stockholders who have entered the fold. There is no evidence that the corporation was in need of new financing, and that the sale of the directors deprived it of the opportunity. It is no answer to say that the corporation could not well have disregarded an advantageous offer of that kind. It does not always follow that the acquisition of cash which might have to lie idle would necessarily be of benefit to it. A moral, if not legal, obligation to pay dividends to the new stockholder would be thus assumed, and the need of a dividend disbursement in excess of previous requirements might prejudice the existing stockholders in the event the new capital acquired did not result in a sufficient increase in earnings to justify the maintenance of the previous dividend. In any event, the evidence is barren of any showing that in selling their stock the directors deprived the corporation of a financial advantage. Such an inference may not be drawn from the mere recital of the transaction, and from speculating upon possible loss to the corporation by this means.

Whether the stockholders who were not afforded the opportunity to participate in the profits of the deal have any grievance is a question not before me, and, therefore, unnecessary to decide. The duty of a director in purchasing shares from a stockholder to make full disclosure, is a much debated question (32 Yale L. J. 637), and the duty of a director selling his shares at an advantageous price is even more obscure. However, for reasons mentioned, this subject requires no extended consideration, because it is not an issue in the case.

We come now to the final question: Are the directors, apart from any special circumstances of bad faith or proof of injury to the corporation, compelled to account to it for any profit made from the sale of their stock above the current quotations?

In my former expression of views I quoted from Cook on Corporations (8th ed.), volume 3, section 650, to the effect that: " It is a well established principle of law that a director commits a breach of trust in accepting a secret gift or secret pay from a person who is contracting or has contracted with the corporation, and that the corporation may compel the director to turn over to it all the money or property so received by him."

Under this principle a director who obtains a secret gift from a third party in handling a corporate transaction is compelled to turn over such gift to the corporation, notwithstanding the fact that the latter may have obtained an advantageous bargain. This is fair not only on the principle of fiduciary relation but as a mere business proposition. If the third party dealing with the corporation had not counted upon giving the secret gift, the corporation might have received the benefit of a further reduction in price, and thus obtained an even more advantageous bargain than it did.

Here, there is not the slightest evidence that any corporate property was involved in the transaction, nor is there any proof that by their conduct the directors deprived the corporation of a profitable and desirable deal. No one will argue that the holder of a large block of the stock of a corporation would be under a duty to account for his profit to the corporation. As such holder he might be in a position to command a considerable premium above current prices in a favorable market. The advantage would be entirely his, for which he would in no way be compelled to respond to the corporation. If it is granted that a director may freely sell his own stock, it must follow that he may benefit from the advantage due to his holding of an exceptionally large block of stock. Possibly, evidence of unfair dealings and conspiracy, such as are charged in the complaint, might make a difference; but in view of the failure of proof in that direction, we are relegated to the abstract principle as to the right of a director to sell his stock freely to the best advantage. This he may do. Consequently, it must follow that there is nothing for which the defendant directors must account to the corporation.

Ordinarily it would be unnecessary to elaborate upon these views any further. But plaintiffs' counsel have presented such a large array of authorities in support of their position that I feel that it is but fair to comment upon a few of them. Their point of departure is the celebrated opinion of Chief Judge CARDOZO in *Meinhard* v. *Salmon* (249 N. Y. 458, 467). No one can take issue with the high etical business standards imposed upon one occupying a relation of trust and confidence to another. But the difficulty is that plaintiffs, in citing that authority, assume the existence of such a relationship and then proceed to draw the inevitable conclusions therefrom. They are thus begging the question. In quoting this case and in the citation of numerous other precedents in an endeavor to extend the doctrine of fiduciary relation to the present case, they remind one of the apt observation of Professor Gray, that "The danger in dealing with abstract conception, whether in the law or in any other department of human knowledge,

is that of losing foothold on actual earth. * * * Much fine-spun speculation has been demolished by showing that it did not fit the facts." (Nature and Sources of the Law, p. 4.)

The cases cited by plaintiffs, in which corporate officers are held responsible for secret profits, differ in many essential details from the one under consideration. In these cases the officer whose conduct was under scrutiny by the court was taking a bribe, or what could be fairly construed as such, from those whose interests were to harm or destroy his corporation, or where the director accepted a commission from a third party who either bought from or sold material to the corporation. In *Archer's Case (Matter of North Australian Territory Co.)* (L. R. [1892] 1 Ch. Div. 322) the director sued had, before becoming a director, insisted that the promoter of the corporation insure him against a loss on his stock. The English court held that this placed him in a position of not acting for the best interests of his company, but for that of the promoter who guaranteed him against loss. In *Finch* v. *Warrior Cement Corp.* (141 Atl. 54, at p. 61), decided by the Court of Chancery of Delaware, the plaintiff sought to hold the defendant accountable for commissions received by him from the brokers who sold the corporate bonds. The contract granting the brokers the privilege of selling the corporate bonds was made between the brokers and the defendants acting as agents of the corporation. The court permitted the recovery on the ground that this profit should belong to the corporation, because the payment by the brokers consciously or unconsciously induced the defendants to sign the contract and the sum paid was at the expense of the corporation. In *Garber* v. *Town* (208 Mich. 1) the Supreme Court of Michigan compelled the president of a corporation, who negotiated a sale of its assets at a price acceptable to the stockholders, to return to the corporation $75,000 in stock of the purchasing corporation, paid to him for engineering the deal. Obviously these cases have nothing in common with the one under consideration.

The Pennsylvania law reports are replete with concrete illustrations of the duties and relations of corporate directors and officers. *Commonwealth Title Insurance & Trust Co.* v. *Seltzer* (227 Penn. St. 410), strongly relied upon by the plaintiffs, to my mind contains very few elements present in the case under discussion. In that case a situation is disclosed in which the president of a corporation known as the Continental Hotel Company, which had practically its whole capital invested in a valuable piece of real estate, conspired with other officers to deprive the corporation of its property. The officers of the corporation came in contact with the agent of another corporation, which desired to buy this real

estate. Although the president knew that his own company was willing to sell its property, instead of treating with the agent of the purchasing corporation on that basis, he led them to believe that the property could not be purchased. Thereafter negotiations were carried on between the president and the agent, as a result of which a written contract was entered into giving the agent an option on a sufficient number of shares of the stock of the corporation to control it. The contract on its face bore evidence of its real purpose, which was to place the agent or his principal in a position to secure the desired real estate. The officers conceived the scheme of buying in enough stock to gain control of the corporation for the agent. The deal whereby the president of the corporation and the other officers sold their stock was but a mere part of the scheme to divest the Continental Hotel Company of its property, and the court properly held that the profit from the sale of the stock should in law and equity be considered part of the profit from the sale of the real estate and should go to the stockholders ot the corporation.

In *Porter* v. *Healy* (244 Penn. St. 427, at p. 437) Judge Moschzisker held that although the stock of one who is a director of a corporation is his individual property to be dealt with as he pleases and to be sold for such a price as he may be able to get for it either in association with others or alone, yet his official position is not his individual property in any sense and he has no right either directly or indirectly to use it for his own selfish ends. When he does so and thereby derives a gain that can be reasonably traced to such an abuse, all the money thus made belongs either to the corporation or in common to its stockholders.

That case, while it involves a related state of facts, also presents marked differences from the one under consideration. There the directors sold their stock in a block which included that of others, the whole block constituting the entire issued and outstanding stock of the company. For their own stock they secured a secret profit in excess of that paid for the other interests. They were held accountable to the others for this profit.

A somewhat similar state of facts as revealed in this trial has recently been passed upon by the Court of Errors and Appeals of the State of New Jersey in *Keely* v. *Black* (91 N. J. Eq. 520). The Farmers Telephone Company was the owner of a telephone system which covered a locality of about 450 miles and four counties in New Jersey. One Black was a director and president, being also the holder of 500 shares. Upon the entrance of this country into the World War the government built a cantonment called Camp Dix at Wrightstown within the territory served by

the Farmers Telephone Company, and made arrangements for service with the Farmers Telephone Company. An agreement was entered into between Black and the Bell Telephone Company, whereby Black agreed to turn over to the Bell Telephone Company all the outstanding stock of the Farmers Telephone Company, or if unable to do so to secure a controlling interest for the Bell system, and the latter agreed to pay him a bonus above the par value of the stock so acquired. The Farmers Company was capitalized at $100,000, being divided into 2,000 shares each of $50 par value. He acquired, including his own shares, about 1,909 shares, and paid par for the shares he purchased. These he transferred to the Bell system and received a bonus of $21,000. He was sued for the amount of this bonus by two stockholders who held a block of 80 shares. The Court of Errors and Appeals reversed a judgment secured by these stockholders. Judge KALISCH, in writing the opinion of the court, demolished the theory of the plaintiffs in the actions before the court, saying: " The dominating idea pervading the vice chancellor's conclusion is, that Mr. Black in acquiring the stock of the stockholders and selling the same, together with his own to the telephone companies acted in a fiduciary capacity. In this view we cannot acquiesce. It is true in bringing about the transfer of the telephone business of the cantonment he was acting in a fiduciary capacity, and any profit he might have made out of that transaction he should account for to his *cestui que trust*. The proof fails to show that he received anything from the Bell Companies or any other source on that account. The moneys paid to him were for his services in acquiring and transferring the stock, and in doing that he did not occupy a position of trust with relation to the company of which he was president. It seems to us that he had a perfect right, as an individual, to purchase the stock from the holders thereof at such prices as he and they should agree on, and after buying it he was entitled to sell it again for such price as he and the purchaser should agree on. In these transactions he occupied no relation of trust either to the Farmers Company or to the various stockholders. For it is important to observe that he was not dealing with the property of the company, but with his own, the title to some of which he derived from other stockholders."

The Court of Appeals in this State has enunciated a similar principle in *Barnes* v. *Brown* (80 N. Y. 527). Judge EARL, in writing for the Court of Appeals, states: " Brown and Seligman were attempting to procure the control of the corporation and its franchises for a legitimate purpose. There is no reason to suppose that they meant it to perpetrate any fraud on the stockholders.

They were dealing with a person who held a majority of the stock and who in virtue thereof had the right and power to control the corporation within the limits of its chartered powers. He had the right to sell out all his stock and interest in the corporation, and in doing so he perpetrated no wrong upon any one."

*Seymour* v. *S. F. C. Assn.* (144 N. Y. 333) is an interesting illustration of the limits of the fiduciary duty. Here a claim was made that officers or directors could not purchase bonds of their company at less than par and recover the face amount from the company. Judge FINCH in his opinion clearly sets out the rights and obligations of directors in the following: "If that be sound doctrine, as is stoutly maintained, if directors cannot in any case invest in the bonds of their own companies except at the peril of a constructive fraud, if they cannot safely buy such bonds below par, because they deem them unduly depressed, if titles to corporate obligations passing through their hands become tainted by their touch, it is quite time that the courts should give, what they have not given, a very definite and distinct warning. Some citations of seeming authority are pressed upon us and others exist. The broad rule is stated in Perry on Trusts (§ 428), that ' a trustee, executor or assignee cannot buy up a debt or incumbrance to which the trust estate is liable for less than is actually due thereon, and make a profit to himself,' and that is the doctrine invoked in this case as applicable to a director regarded as a trustee of the corporation. But the statement, however correct in its application to specific instances, must be taken with the limitations which belong to it. Its foundation is that a fiduciary agent, owing a duty to his principal, cannot make a contract for his own benefit which is or may be inconsistent with that duty, and the cases generally are of two kinds. The trustee buys in the property of his principal at a sacrifice for his own benefit, when, if he bought it at all, it was his duty to do it for his principal, or he makes a contract in behalf of his principal with himself directly or indirectly as the other party to the agreement. The first class of cases is illustrated by *Slade* v. *Van Vechten* (11 Paige, 26), where the assignee bought in assigned property at a sheriff's sale and claimed the personal benefit of his bargain; and the second class by *Munson* v. *S., G. & C. R. R. Co.* (103 N. Y. 58), in which the directors contracting had a private and personal interest, possibly adverse to their fiduciary duty. Almost, if not quite all, of the cases cited by the learned counsel for the appellant belong to one or the other of these two classes. But they do not decide this case, for Hotchkiss and Seymour neither bought in any property of the company nor dealt with the corporation in any respect.

They made their contract, not with it, but with third persons capable of protecting their own rights, and bought nothing which the corporation owned or to which it had a right. We must go to still other cases, founded it may be to some extent upon similar ideas of fiduciary duty, to discover even an approximate authority. There are cases of copartnership in which the general rules pertaining to that specific relation might prove to be broad enough to cover the purchase of the debt owing by the firm, (*Am. Bk. Note Co.* v. *Edson*, 56 Barb. 89), and other cases in which the duties flowing from a liquidation conducted by the trustee, and as to which he owes a specific trust duty, forbid a purchase by the trustee for his own benefit at a discount. But in every class of cases the rule is founded upon the unwillingness of the law to uphold contracts which bring into collision the trust duty and the personal interest, and it is because of that collision, and the temptations which surround it, that it declares the contract voidable at the election of the beneficiary without investigating the good or bad faith of the trustee. The entire basis of the rule consists in this collision between trust duty and personal interest, and the equitable prohibition has no application where there is no such possible inconsistency. There is no such conflict in the ordinary case of the purchase by a director in a going corporation of its outstanding obligations. There is no present duty resting upon him to extinguish them. The time for that has not come, the duty has not arisen, may never arise, the corporation is not prepared to pay, does not contemplate paying, but intends and expects to await the full maturity of the debt. Unless some special fund has been provided, or some special liquidation has been ordered, the director owes no duty to his company to discharge or buy in the outstanding bonds, and may purchase for himself because no inconsistent trust duty has arisen. Why should he not? While the bonds are running to their maturity, and the corporation is not able to extinguish them, is not bound to do so, does not even wish or seek to do so, what does it matter who holds the securities or on what terms they pass from hand to hand? It seems to me that we are asked to crowd the rule almost to the verge of an absurdity, and to inflict a vital injury upon business interests by tainting with invalidity the holding by a director of the unmatured obligations of the corporation bought by him in the open market and not put in liquidation or sought to be extinguished. There must at least be some fact or circumstance which charges the trustee with a present duty to act for his company in respect to the bonds, which duty is or may be inconsistent with a personal

purchase. No such duty rested upon Hotchkiss and Seymour, and they had a right to buy and hold for their own benefit."

Finally it is interesting to observe the anomalous situation which a decree in favor of the plaintiffs in their representative capacity would create. The action is based upon an alleged conspiracy between Fox and the individual defendants, whereby the defendants, induced by Fox, breached an alleged fiduciary obligation. On the record Fox is the present owner of about forty-five per cent of the outstanding stock. A finding for the plaintiffs would result in enriching one of the alleged conspirators to the extent of forty-five per cent of the net amount of the restored property. This anomaly was recognized by Judge KALISCH in *Keely* v. *Black* (*supra,* at p. 523) in the following observation: " It is further to be noted that to carry out the decree of the court below would lead to an anomalous situation. For, as it appears, the holder of all the stock of the Farmers Telephone Company, except the eighty shares of the two complainants, is the Bell company * * *. Now, if the money received by Black above the par value of the shares is to be paid back to the Farmers company, the result is that the Bell company, after having made the contract regarding the purchase of the stock with Black, and having paid its money in performance of the contract, will get back nineteen-twentieths of the amount so paid. We cannot conceive of a more unjust and inequitable result than to force the Bell company to take back this money which it paid in good faith and for the return of which it does not ask."

Defendants are entitled to judgment dismissing the complaint. Reserved rulings upon objections are disposed of separately. Submit decision and judgment on notice.