397 P.2d 56

**Mark GOODE, Appellant,**

v.

**Gene C. POWERS and Casualty Insurance Managers, a corporation, Appellees.**

**No. 6900.**

Supreme Court of Arizona.

En Banc.

Dec. 2, 1964.

Evans, Kitchel & Jenckes, Phoenix, for appellant.

Foster G. Mori, John E. Madden, John Geoffrey Will, and John S. Schaper, Phoenix, for appellees.

UDALL, Chief Justice.

Gene C. Powers, hereinafter referred to as appellee, sued Mark Goode, hereinafter referred to as appellant, to collect the balance due on a contract. Appellant's sole defense was that the contract was contrary to public policy and, therefore, illegal. The lower court entered judgment for the appellee and this appeal resulted.

Since the case was tried to the court and no express findings were made, we must presume that the lower court's conclusions on every necessary issue and its findings on every controverted fact are such as to support the judgment. Foote v. Gerber, 85 Ariz. 366, 339 P.2d 727 (1959). If there is any reasonable evidence to support the judgment, it must be affirmed. State Tax Commission v. Graybar Electric Company, 86 Ariz. 253, 344 P.2d 1008 (1959).

The facts are as follows: In 1952, the appellee entered into negotiations with L. H. Walden and the appellant for the sale of the appellee's interest in Commercial Benefit Insurance Company, an Arizona corporation engaged in the business of selling life, health, and accident insurance. On February 26, 1953, the appellee contracted to sell Walden twenty shares of Commercial and an option to purchase an additional 450 shares at $100 par. If exercised, this option, together with the other shares, would constitute twenty-five per cent of the shares of Commercial and therefore, would provide effective control over the company. In return, Walden agreed to pay approxi-

mately $190,000. The contract contained a stipulation that if the year-end statement showed a surplus less than that indicated by the preliminatry statement, the sale price would be reduced by the amount of the deficiency. On July 7, 1953, the appellee and Walden entered into a new contract which reduced the purchase price to approximately $166,400. On December 2, 1953, by novation, the appellant was substituted for Walden and the purchase price was further reduced to $155,000. The purchase price was modified to $160,000 by the appellant and the appellee on June 4, 1954.

This action was instituted by the appellee against the appellant for the purpose of recovering $40,000 alleged to be due under the above contracts. Approximately $120,000 had already been paid on the contract by appellant. The appellant answered and admitted the allegations of appellee's complaint, but raised an affirmative defense that the contracts upon which appellee's complaint is predicated are contrary to public policy, illegal, void and unenforceable in that the acts of appellee in selling his corporate stock and the stockholders' proxies held by him, thereby delivering the controlling interest of Commercial to Walden for a profit not enjoyed by other stockholders, constituted a breach of his fiduciary duty to the other stockholders.

This appeal presents only one issue: Did the lower court, under the existing record, correctly rule that the contract in question was not contrary to public policy?

The record indicates that the following circumstances existed at the time of the contract between the appellee and Walden on February 26, 1953. There were 1543 outstanding shares of Commercial. The appellee was president of Commercial and held proxies of a majority of the shareholders. Negotiations for the contract were based on Commercial's annual report which contained the following figures: Commercial had sustained a loss of $23,785.23 during the previous year; had in effect life policies in the face amount of $1,383,000; and had collected accident and health policy premiums amounting to $782,000. The surplus of Commercial was $65,300 and the capital was $155,000. By exercise of the option, the capital of Commercial would increase to $200,000. The appellee's twenty shares and his option gave him effective control of Commercial. Following the execution of the contract, the appellee arranged for the resignation of the existing directors and delivered into escrow all shareholder proxies in his name. Thereafter, the appellee ceased to have any connection with Commercial.

The basis of the controversy in this case appears to be the valuation of the Commercial stock sold by the appellee on February 26, 1953. The appellant claims that appellee sold his stock for $500 per share when actually it was worth only $200. Appellant

contends the $300-difference per share represents what appellee received for his office and for control of the company; this constituted a profit not enjoyed by the other shareholders. Appellee, on the other hand, contends that the purchase price of the stock was well within the range of its "equity" and "market" values as established during the trial. Consequently, appellee asserts that his acts of arranging the resignation of the directors and of delivering proxies to Walden were entirely gratuitous.

During the trial, three experts testified as to the value of the Commercial stock on February 26, 1953. All three experts agreed as to the method for deriving the equity value of a life and accident-health insurance company. A value is placed on the outstanding insurance business and this value is then added to the company's capital and surplus; the aggregate is divided by the total number of outstanding shares in order to arrive at a per share equity value.

The three experts also agreed that other factors such as 1) the "control" made possible through a stock purchase, 2) the sales personnel of the company, and 3) the acquisition of control of a company already admitted to sell in a state, operate to make market value different from equity value. The experts agreed that the market value of insurance company stocks was generally higher than equity value.

The two experts called by the appellee testified solely as to the range of equity value of life and accident-health stock at the time of the contract in question. Using their method for calculating equity value,[1] the range of equity value of a share of Commercial stock was a high of $539.79 and a low of $341.33. Based on these figures, the eventual purchase price of $160,000 was less than the average equity value of $162,063.20 for an equivalent number of shares.[2]

1. These experts testified that equity value at that time was determined by the following rule of thumb. First, the value of the accident-health insurance business would be based on the previous year's premium and would be within a range of six months of that premium and one year of that premium. This formula produces a range of value of $780,000 and $390,000. Second, the value of the life insurance business would be based on the amount of the face value of such insurance in force and would be within a range of $20 per thousand thereof and $25 per thousand thereof. This formula produces a range of value of $34,575 and $27,660. Third, the equity value of a share of com-

pany stock would then be determined by adding to these values the amount of the company's capital ($200,000) and surplus ($65,000) and dividing the aggregate by the number of outstanding shares (2,000).

2. Valuing the 450 shares under the option at a rate that takes into account the option price, the computations are:
 20 shares at $539.79 ..... $ 10,795.80
450 shares at $439.79 ..... 197,905.50
High .. $208,701.30
 20 shares at $341.33 ..... $ 6,826.60
450 shares at $241.33 ..... 108,598.50
Low ... $115,425.10
The average is $162,063.20.

Mr. Betz, the appellant's expert witness, did not differ substantially with the other experts' equity valuation of Commercial's life insurance business which he fixed at $27,660. But his overall equity valuation of the stock differed radically from that of the other experts. His first opinion was $77,000, which he later reduced to $40,000. But in view of all of the testimony of Mr. Betz, it is clear that his credibility was in issue. On direct examination, Mr. Betz indicated that he had no connection with the appellant. On cross-examination, however, he testified that he now lives in the same town as appellant (Bunkie, Louisiana) and sees appellant "practically every day."

Mr. Betz was a director of Commercial at the time of the appellee-Walden contract and continued as actuary after the appellant took over the company.

■ When confronted by conflicting expert testimony, the lower court in this case resolved the conflict against the appellant. But even Mr. Betz's opinion was as to the equity value of the stock and all three experts agreed that market value is generally higher than equity value. Consequently, we find nothing clearly erroneous in the lower court's ruling that the purchase price for appellee's stock and option was well within the range of even the equity value of the stock.

■ The circumstances surrounding the contract of February 26, 1953, as well as the purchase price of $160,000, conform to the general rule as stated in Tryon v. Smith, 191 A. 172, 229 P.2d 251 (1951) at 254:

"It is generally held that majority stockholders may sell their stock at any time and for any price obtainable without informing other stockholders of the price or terms of sale, provided they act in good faith. 3 Fletcher, Corporations (Perm. Ed.), § 900; 19 C.J.S., Corporations, § 793, page 171; 13 Am.Jur., Corporations, § 1010, p. 962; Roby v. Dunnett, 10 Cir., 88 F.2d 68; Stanton v. Schenck, 140 Misc. 621, 251 N.Y.S. 221; Levy v. American Beverage Corp., 265 App.Div. 208, 38 N.Y.S.2d 517; Ryder v. Bamberger, 172 Cal. 791, 158 P. 753; McCord v. Martin, 47 Cal.App. 717, 191 P. 89; Blakeslee v. Wallace, 6 Cir., 45 F.2d 347.

"The rule is well laid down in Fletcher, supra, at p. 306, as follows: 'Ordinarily a director possesses the same right as any other stockholder to deal freely with his shares of stock and to dispose of them at such a price as he may be able to obtain, provided the director acts in good faith, since the corporation as such has no interest in its outstanding stock or in dealing in its shares among its stockholders. In other words, the mere fact that a man

accepts the position of a director or an official in a corporation should not as a rule deprive him of his right to dispose of his stock as he sees fit and to make any profit that he might gain, provided in the sale of that stock he has done nothing to injure the corporation and its stockholders.'

\*     \*     \*     \*     \*     \*

" \* \* \* The fact that Smith et al. received more for their stock than the minority is no evidence of fraud, since it is generally recognized that the stock of majority stockholders is of more value than that of the minority. Stanton v. Schenck, supra."

The majority shareholders in Tryon had received $460 per share as opposed to $220 per share by the minority shareholders. In the instant case, appellee received a price for his stock which was well within the range of its equity and market values as established during the trial.

As the testimony of the two expert witnesses of appellee indicates, the instant case is readily distinguishable from those cases where a director, in addition to the reasonable value of his stock, received a bonus for relinquishing his control of his office or conspired fraudulently to turn over control to purchasers who looted the company. See, e. g., Gerdes v. Reynolds, Sup., 28 N.Y.S.2d 622 (1941); Ballantine v.

Ferretti, Sup., 28 N.Y.S.2d 668 (1941); Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955); Insuranshares Corporation of Delaware v. Northern Fiscal Corporation, 35 F.Supp. 22 (E.D.Pa.1940); Seagrave Corp. v. Mount, 212 F.2d 389 (6th Cir. 1954); and Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S.W.2d 344 (1948). Having examined the record in the instant case, we conclude that there exists ample evidence to support the trial judge's ruling that the purchase price of the stock was reasonable and not exorbitant.

█ █ Consequently, we find no merit in the appellant's contention that much of the purchase price of the stock constituted payment for arranging the resignation of the directors and delivering proxies to Walden. It may be that appellee took some part in securing the resignation of the directors, but this was not contrary to public policy because the trial court concluded it was not done for consideration. See Mitchell v. Dilbeck, 10 Cal.2d 341, 74 P.2d 233 (1937). Similarly, the trial court was justified in concluding that the price received for the stock was reasonable and the transfer of proxies to Walden was a mere incident to the sale which was not part of the consideration for the purchase price.

If the appellee had agreed for monetary consideration to cause the directors to re-

sign and to deliver proxies, then such an agreement would be contrary to public policy. Mitchell v. Dilbeck, supra, 10 Cal. 2d 341, 74 P.2d at 236. Since the appellant is attempting to escape his contractual obligation by claiming the contract is illegal, he must show clearly and unequivocally that the appellee has done such an act. In our opinion, appellant has not done so and, therefore, we find no reason to reverse the judgment of the lower court.

To avoid confusion in future cases, we should point out that the alleged illegality in this contract is not one upon which the appellant here is in a position to rely. If a majority stockholder sells control in disregard of the rights of minority shareholders or of creditors they may reach their share of the funds in the nands of the selling stockholder. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. 3 Fletcher, Corporations (Perm.Ed.), § 900, et seq. The rule is not applied for the benefit of the purchaser to enable him to renege on his contract and secure control of the corporation without payment to anyone. Deeds v. Gilmer, 162 Va. 157, 174 S.E. 37, 74, 3 Fletcher, Corporations (Perm. Ed.), § 906.

Judgment affirmed.

LOCKWOOD, V. C. J., and STRUCKMEYER, BERNSTEIN, and SCRUGGS, JJ., concurring.