Robert S. CALVERT, Comptroller of Public Accounts, et al., Appellants,

v.

CAPITAL SOUTHWEST CORPORATION et al., Appellees.

No. 11649.

Court of Civil Appeals of Texas.

Austin.

April 30, 1969.

Rehearing Denied May 28, 1969.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., Hawthorne Phillips, Executive Asst. Atty. Gen., W. V. Geppert, Staff Legal Asst. Atty. Gen., John R. Grace and W. E. Allen, Asst. Attys. Gen., and William B. Hilgers, Sp. Asst. Atty. Gen., Austin, for appellants.

Akin, Vial, Hamilton, Koch & Tubb, Henry D. Akin, Jr., Charles McGuire, III, Johnson, Bromberg, Leeds & Riggs, Louis P. Bickel, J. Richard Gowan, Dallas, Clark, Thomas, Harris, Denius & Winters, Franklin W. Denius, Roderick Edens, Jr., Barry K. Bishop, Austin, for appellees.

HUGHES, Justice.

This appeal is from a judgment rendered after consolidating Causes 128,252, Capital Southwest Corporation v. Robert S. Calvert, Comptroller et al, Cause No. 127,416, Electro-Science Investors, Inc. et al v. the same defendants, and Cause No. 127,415, Texas Capital Corporation v. the same defendants.

Each of the plaintiffs below, appellees here, sued Robert S. Calvert, Comptroller of Public Accounts, Jesse James, Treasurer and Crawford C. Martin, Attorney General, all officials of Texas, to recover franchise taxes paid by them under protest, Capital Southwest seeking recovery of $251,448.94 plus interest, Electro-Science et al seeking recovery of $97,820.86 plus interest, and Texas Capital seeking recovery of $146,-704.05 plus interest. Trial to the Court without a jury resulted in judgment for appellees in accordance with their respective prayers.

There are no findings of facts or conclusions of law by the trial court and none was requested.

While appellants have five points and appellees five counterpoints, the parties agree that the sole issue presented is whether the three appellee corporations, severally, were "mutual investment companies" within the purview of Art. 12.03, Title 122A, Taxation-General, V.A.C.S.,[1] during the respective periods of time in controversy and therefore exempt from the franchise tax imposed by Ch. 12, Title 122A, Taxation-General.

Certain mutual investment companies were first granted exemption from the

---

1. All statutory references herein are to Vernon's Annotated Civil Statutes unless otherwise noted.

franchise tax by an amendment to Art. 7094 R.C.S. in 1951 when S.B. 6, Ch. 143, Acts 1951, 52nd Leg. p. 245 was enacted. There have been subsequent amendments to this statute, now Art. 12.03, supra, which are not relevant here and will not be noticed. We copy in full the 1951 amendment, including the emergency clause:

"Be it enacted by the Legislature of the State of Texas:

Section 1. That Article 7094, Revised Civil Statutes of Texas of 1925, as amended, be and the same is hereby amended so as to read hereafter as follows:

'Article 7094

'The franchise tax imposed by this Chapter shall not apply to any insurance company, surety, guaranty or fidelity company, or any transportation company, or to any corporation organized as a terminal corporation not organized for profit and having no income from the business done by it, or to any sleeping, palace car and dining car company now required to pay an annual tax measured by their gross receipts, or to corporations having no capital stock and organized for the exclusive purpose of promoting the public interest of any city or town, or to corporations organized for the purpose of religious worship or for providing places of burial not for private profit, or to corporations organized for the purpose of holding argicultural fairs and encouraging argicultural pursuits, or for strictly educational purposes, or for purely public charity, or to State-chartered building and loan associations, or to any mutual investment company registered under the Federal Investment Company Act of 1940, as from time to time amended, which holds stocks, bonds, or other securities of other companies solely for mutual investment purposes.'

Sec. 2. The fact that the sole source of income of such mutual investment companies is from receipt of dividends or interest on stocks, bonds, or other securities of other corporations (held solely for investment purposes by such mutual investment companies), and the fact that such other corporations already are subject to and pay a franchise tax; that the subjection of such mutual investment companies to a franchise tax in effect taxes the same source twice, as is recognized by the Federal Government in exempting from Federal Income Taxes the income of such mutual investment companies which is distributed to their shareholders; the fact that mutual investment companies doing business in many other States are granted exemptions from franchise taxes whereas mutual investment companies doing business in the State of Texas are not exempt from franchise taxes, thereby placing the latter companies at an unfair disadvantage with respect to selling its shares to Texas investors; that such mutual investment companies should be encouraged to do business in Texas; that the calendars of both Houses are likely to become crowded; and the further fact that the changes proposed herein need to become effective at the earliest possible time, create an emergency and an imperative public necessity, authorizing the Constitutional Rule requiring bills to be read on three several days in each House be suspended; and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted."

This statute contemplates that in order for a corporation to be exempt from payment of franchise taxes that it: (1) be a mutual investment company; (2) be registered under the Federal Investment Company Act of 1940, as from time to time amended; (3) hold stocks, bonds, or other securities of other companies solely for mutual investment purposes; (4) receive

its sole source of income from dividends or interest on stocks, bonds, or other securities of other corporations (held solely for investment purposes); (5) hold stocks, bonds, or other securities of only those corporations which are subject to and pay a franchise tax; (6) distribute its income to its shareholders in such manner as recognized by the Federal Government in order to exempt its income from Federal Income Taxes.

Appellants discuss these statutory provisions as follows: (1) under Point One; (2) under Point Two; (3–6) under Point Four.

We observe that there is no material conflict or contradiction in the evidence.

■ Appellants' first Point is that the trial court erred in holding any of appellees to be a mutual investment company under Art. 12.03 because the charter and by-laws of each appellee preclude such classification.

■ Point Two is that the trial court erred in holding appellees mutual investment companies merely because they were registered under the Federal Investment Act of 1940.

We sustain these points.

Appellees were all small business investment companies registered under the Federal Investment Company Act of 1940 and licensed under the Small Business Investment Act of 1958.

The charters of each of these corporations and their amendments are in the record. A summary of these charters shows that each appellee had the authority[2] to operate as a Small Business Investment Company, to deal in stocks, bonds, debentures, obligations and evidences of indebtedness of foreign or domestic corporations, to consult and advise small business firms on a fee basis and to accumulate and lend money. In addition, Electro-Science had charter authority to invest in any manner not prohibited by law; to underwrite securities; to act as agent for underwriter; to engage in any mercantile, manufacturing or trading business; to enter into any kind of association; to engage in the oil business.

The management of each appellee is in its Board of Directors or Executive Committee, which Board or Committee appoints corporate officers whose duties and authority are stated in the by-laws.

An analysis of the by-laws, stock registration forms and prospectuses contained therein of appellees shows that all three will be governed by the Federal Small Business Administration and as a Small Business Investment Company; that the securities of each appellee are offered to the public as being "A Speculation;"[3] that the portfolio holdings of each appellee are "High Risk;" that all appellees contemplate control of and have exercised control of some of their portfolio companies; that each appellee proposes to furnish management, financial and advisory services for small business concerns, Texas Capital having executed contracts of advisement. All appellees may purchase or sell commodities or commodity contracts; all appellees may borrow money for the purposes of financing small business concerns; all appellees may be deemed underwriters of securities; all appellees may make long term loans; they may purchase warrants and options incident to stock of other companies; investment in appellees as Small Business Invest-

---

2. This listing of authority is not complete.

3. "Speculation" is defined in Webster's Third New International Dictionary, unabridged (1966) as follows: "speculation 5a: an act of speculating (as by engaging in business out of the ordinary, by dealing with a view to making a profit from conjectural fluctuations in the price rather than from earnings of the ordinary profit of trade, or by entering into a business venture involving unusual risks for a chance of an unusually large gain or profit) * * * contrasted with investment."

ment Companies are more significant to investors in the higher income tax brackets.

The term "mutual investment company" is found in only one Texas statute, Art. 12.03, supra.

The term was used in the Federal Revenue Act of 1937 and the Revenue Act of 1938.[4] Both of these Revenue Acts provided that a "mutual investment company" should meet certain requirements, one of which was:

"Its shareholders are, upon reasonable notice, entitled to redemption of their stock for their proportionate interests in the corporation's properties, or the cash equivalent thereof less a discount not in excess of 3 per centum thereof."

These provisions were omitted from the revenue laws in 1942. The Act of 1942 granted certain favorable tax treatment to companies of a different type, having different qualifications and called a "regulated investment company."[5]

The conclusion is compelled that a regulated investment company is a very different type of company from a mutual investment company. Each time and only, in the Revenue Acts of 1937 and 1938, when the Congress defined a mutual investment company in accordance with the generally accepted qualifications of a mutual company did it refer to the company as a mutual. When it changed the nature of the company by defining it differently it changed the legal term used to refer to it from mutual to regulated.

In 1947, about three years prior to the enactment of the relevant amendment to Art. 12.03 in 1951, the case of New York Stocks, Inc. v. Commissioner of Internal Revenue, 164 F.2d 75 (2d. Cir. 1947) was decided. The issue before the Court was whether earnings distributed on redemption of its shares were taxable under the Revenue Act of 1938. In holding for the

taxpayer and in discussing the nature of a "mutual investment company" and the requirement that such companies redeem their stock as required by the Revenue Acts of 1937 and 1938 the Court said:

"Petitioner, an 'open-end' investment company, offers shares of its stock for sale and invests the proceeds therefrom in securities. Its stock is issued in 21 series, each designated by the name of a different industry. As shares are sold the proceeds are invested in securities of those companies engaged in the industry indicated by the name of the series, and the shareholder participates only in assets derived from the series in which he holds a share of special stock.

Petitioner's charter provides that any holder of special stock may, at his option, offer it to the petitioner for redemption on any day on which the New York Stock Exchange is opened for business. Special stock is redeemed at a figure equal to the shareholder's proportionate interest in the 'net asset value' of the series, less a small redemption charge. Included within the 'net asset value' of any series is the income accrued thereon during the taxable year. The net asset value is determined as of the date of redemption elected by the shareholder, and petitioner is obligated to pay the net amount payable on such redemption within three days after the determination thereof.

\*    \*    \*    \*    \*    \*

The background of the problem is found in the change in corporate taxation inaugurated in the 1936 Act. At this time, in order to avoid income accumulation by corporations, Congress enacted a drastic surtax upon undistributed income, § 14, 26 U.S.C.A.Int.Rev.Acts, page 823, but allowed the corporation credit for dividends paid to its shareholders, § 27, 26 U.S.C.A.Int.Rev.Acts, page 837. In

4. Title 26 U.S.C.A. "Internal Rev. Acts 1924 to date" (copyright 1940 (pps. 842–843) and id. pps. 1124–1125, respectively.)

5. See Title 26 U.S.C.A. Secs. 361, 851–855. (Internal Rev.Code 1954).

the then subd. (g), which became (h) of the 1938 Act, it excluded from such credit dividends which were not fairly distributed among all of a class of shareholders, but gave some a preference in the distribution. Later acts made some changes in this general plan of corporate taxation, so that the applicability of § 27, I.R.C., 26 U.S.C.A.Int.Rev.Code, § 27, is now restricted to certain types of corporation, one of which was the *'mutual investment company'* (the 'regulated investment company' of the 1942 and later Acts). *Since such a company was more a conduit for investment by small investors than an ordinary business corporation operated for profit,* it was given special treatment, including not only the basic surtax credit of § 27(b) for dividends distributed, but also the favor of a flat tax on its taxable income. Act 1938, §§ 361, 362, 26 U.S.C.A.Int.Rev. Code, §§ 361, 362. [p. 77] * * * We think the nature of such a company, defined and given favorable tax treatment under § 361, has not been given due weight below or by the respondent. It offers a means by which the shareholder can presumably obtain expert supervision and diversity in his investment and at the same time retain complete discretion as to when to sell. At the sale of his shares the price is not determined by any capricious value judgment on the part of the petitioner, but rather by the vicissitudes of the market. *The shareholder on selling stock of a special series gets his proportionate share of the accrued net income of those companies that make up the series. Thus one who redeems prior to a dividend date will get his pro rata share of the earnings for the period he held his shares, while he who retains his stock gets the earnings over the entire period.* * * * *But the statute requires this feature of the business in order that it qualify as a mutual investment company.* * * * *More important is the fact that every shareholder receives his fair proportion of the earnings during the period he elects to remain an owner,* those redeeming being paid when they redeem, those retaining ownership being paid at the end of petitioner's dividend period. Since the decision to retain or redeem is left to the unfettered judgment of the shareholder, there is no preference and no injustice to any shareholder." * * * [p. 78–79] (Italics added)

The term "mutual investment company" is defined in Webster's Third New International Dictionary, unabridged (1966) as follows:

"mutual investment company or mutual investment trust: an investment company that has a variable number of shares outstanding and that is ready at any time to issue or redeem shares at or near current liquidating value."

Mr. Lamar Ozley, Vice President of Texas Capital, testified on this subject as follows:

"Q  Well, in characterizing yourself as a mutual investment company, how do you distinguish yourself from an investment company.

A  I would say that the prime—I'm not real sure you can distinguish between an investment company under the Investment Company Act of 1940 and a mutual investment company. But the reason I consider us a mutual investment company is because of what I consider the mutuality of interest that our shareholders have in the portfolio companies we invest in.

Q  Isn't that true of every investment company?

A  I would say that might possibly be. I'm not really that clear on what other kind of company would be an investment company and not be a mutual investment company. If you can describe one to me, than I would be willing to make a stab at it."

Mr. Clifford J. Osborn who testified on behalf of all appellees testified on this subject as follows:

"Q  I believe you said a few minutes ago that a mutual investment company included holding companies, investment companies, mutual funds, closed-end investment companies. What distinguishes—

A  I don't believe I included holding companies as a mutual investment company.

Q  Why isn't a holding company a mutual investment company?

A  Well, in my own personal definition, it's one that owns and controls and directs the companies it owns. A mutual investment company is a company whose intent in direction is the investment of its funds.

Q  What makes an investment company a mutual investment company?

A  They are all mutual investment companies. These companies right here are investment companies."

It is to be noted here that none of appellees is obligated to redeem its stock. Also, that few of the securities owned by appellees are listed on any stock exchange.

Our Texas insurance laws make a distinction between mutual insurance companies whose policyholders comprise its members and stock insurance companies whose shareholders may or may not be policyholders.[6]

Such stock insurance companies are never referred to as mutual companies. To make the distinction more clear, several statutes authorize mutual companies to convert to stock companies, and vice versa, for stock companies to convert to the mutual form.[7]

This process of converting from a stock to a mutual insurance company transfers ownership of the company from stockholders to the policyholders. This established procedure and condition has been described as follows:

"* * * Mutualization involves the transfer of ownership of an insurance company from the stockholders to the policyholders. This change of ownership is brought about by the stockholders surrendering to the insurance company their stock for an agreed price. On the surrender of the stock, the company then belongs to the policyholders." Western and Southern Life Insurance Company v. United States, 163 F.Supp. 827, 143 Ct.Cl. 460 (1958) (at p. 829).

Another distinguishing feature of a mutual company is that it usually has no capital stock. In a capital stock company the capital represents the interest of the stockholders and is composed of both capital and surplus. On the other hand, in a mutual company there is usually no capital, and surplus merely represents the excess by which assets exceed liabilities. For example, as to life insurance companies see the following Articles of the Texas Insurance Code, V.A.T.S.: Articles 3.22; 11.01, Sec. 1, subd. 5 and Sec. 2(c). As to mutual companies other than life see Article 15.04, subdivision 2, and Article 15.06. As to farm mutual companies see Article 16.06 (b). Further, as to this type of company only certain bona fide policyholders may be directors of the company. Art. 16.16.

Our Texas Legislature has authorized Mutual Loan Corporations by Title 46, Credit Organizations, subdivision 3, being Articles 2500 et seq. This Title also authorizes certain other types of co-operative credit and loan organizations. The type of loan organization denominated a Mutual Loan Corporation is a true mutual com-

---

6. Vernon's Texas Insurance Code: Art. 1.14, Sec. 2; Ch. 11, particularly Arts. 11.01, 11.04, 11.12 and 11.15; and Arts. 21.27, 10.40 and 17.01; and Chs. 15 and 16.

7. Vernon's Texas Insurance Code, Arts. 11.01, Sec. 2(c), 11.10, 21.27, 10.40 and 14.63.

posed of member stockholders. The Legislature, by including this type of organization alonge with the other co-operative types covered by Title 46, has clearly expressed its intent that the term mutual is to be restricted to the pure mutual type of organization.

In addition, we find three different kinds of purely co-operative organizations which have been specifically exempt from the franchise tax. These are: (1) Co-operative Credit Associations, Articles 2508–2513, exempt by Article 2512; (2) Farmers' Co-operative Societies, Articles 2514–2524, exempt by Article 2518; and (3) Corporations organized under Article 5737 et seq., the Co-operative Marketing Act, so named in Article 5738(a) (3), exempt by Article 5764.

We also find that purely co-operative or mutual fire insurance companies are exempt from the gross premium receipts tax imposed by Article 7064 by the latter provisions of that Article.[8]

■ It is well settled that a franchise tax is levied by the State against certain corporations for the privilege granted them to do business in the State, and that whether they actually do any business is immaterial. Federal Crude Oil Co. v. State, 169 S.W.2d 283, Tex.Civ.App. Austin, writ ref., cert. den. 320 U.S. 758, 64 S.Ct. 66, 88 L.Ed. 452 (1943).

■ It is elemental that a corporation has only such powers as are granted in its charter and that these powers can be amended only in the manner prescribed by law.

■ It is also well settled law that the charter of a corporation creates contractual relations between the corporation and its shareholders, between the shareholders themselves, and that the rights growing out of this relationship are constitutionally protected. Hopkins Federal Savings & Loan Ass'n v. Cleary, 296 U.S. 315, 340–341, 56 S.Ct. 235, 80 L.Ed. 251 (1935); St. Regis Candies, Inc. v. Hovas, 8 S.W.2d 574, 579 (Tex.Civ.App., writ dism. 1928); Garey v. St. Joe Mining Co., 32 Utah 497, 91 P. 369, 12 L.R.A.,N.S., 554 (1907); Somerville v. St. Louis Min. & Mill Co., 46 Mont. 268, 127 P. 464, 465, L.R.A.1915B, 811 (1912); Clearwater v. Meredith, 1 Wall. (68 Wall.) 25, 39–40, 17 L.Ed. 604 (1864); Mohall Farmers' Elevator Co. v. Hall, 44 N.D. 430, 176 N.W. 131 (1920) and 13 Am. Jur.2d, Corporations Secs. 25, 100, 225, 463.

■ When the public is concerned, the State has the right and the duty to confine a corporation to the powers granted in its charter. Taylor Feed Pen Co. v. Taylor Nat. Bk., 181 S.W. 534, Tex.Civ. App. Austin; rev. on other grounds 215 S.W. 850 (1919); Hopkins Federal Savings and Loan Association v. Cleary, 296 U.S. 315, 56 S.Ct. 235 (1935).

We are concerned here with the power and authority of appellees only insofar as they affect the rights of the State as reflected by this record.

Secs. A, B and C of Art. 2.22, Business Corporation Act, Vol. 3A, V.A.T.S., provide that the charter or by-laws of a corporation may restrict the sale or transfer of its stock as therein stated, Sec. C providing that "The pre-emptive rights of a shareholder to acquire unissued or treasury shares of a corporation may be limited or denied by the articles of incorporation * * *."

The charters of appellee Corporations expressly denied their shareholders any pre-emptive rights. They were all incorporated under the Texas Business Corporation Act.

The refusal of pre-emptive rights in effect creates three classes of shareholders: first, those owning a majority of the origi-

8. The terms "cooperative" and "mutual" are often uesd interchangeably. Keystone Automobile Club Casualty Co. v. Commissioner of Internal Revenue, 122 F.2d 886 (3rd Cir. 1941, cert. den. 315 U.S. 814, 62 S.Ct. 799, 86 L.Ed. 1213).

nal issue of stock; second, those owning a minority of such shares; and third, those shareholders or outsiders favored who are allowed to purchase additional shares as opposed to shareholders who might have and exercise their pre-emptive rights to purchase such additional shares.[9]

As a practical matter, a shareholders' interest in the corporation is diluted equally whether originally or newly authorized shares are issued and irrespective of the purposes or considerations for such issuances.

The voting strength of shareholders who are denied pre-emptive rights is curtailed to the extent they are denied the right to acquire additional shares.

The dilution of interest in the corporate assets and surplus and earnings of shareholders having no pre-emptive rights upon the issuance of additional shares is self evident.

Another aspect of the non-relatedness of the value of the shares of shareholders in the appellee companies with reference to their asset or liquidating or market value are the provisions of Articles 2.15 A, B and C of the Texas Business Corporation Act. These provide that shares, including treasury shares, may be issued by the corporation for such consideration as shall or may be fixed from time to time by the board of directors. Thus the value of shares has passed from the asset value of those shares and the value of those shares in the market to the board of directors. To compound the indefiniteness of the value of one's shares our courts hold that securities may be used in the payment of stock and that the value of these securities may be ascertained by other than their asset or market value. Commonwealth Bonding & Casualty Ins. Co. v. Hollifield, 220 S.W. 322 (Tex.Comm.App.1920).

Texas Capital was incorporated with two classes of stock, the larger number of which was without voting rights. This provision together with the provisions in appellees' charters reserving to each the authority to dispose of treasury stock could adversely affect the value of shareholder's stock in many conceivable situations, some of which will be noted.

Shares of the minority, as to price per share, may sell for much less than the price per share of the majority or of the component members of the majority, or of an individual or group who may own much less than the majority of the outstanding stock but who may still exercise an influential or dominant control over the directors and officers of the corporation. Or, the shares of the minority may have a market value measured by only a small percentage of the value of the majority shares; or such minority shares might have hardly any value at all. Perlman v. Feldmann, 219 F.2d 173, 50 A.L.R.2d 1134 (2d Cir. 1955, cert. den. 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277); Stanton v. Schenck, 140 Misc. 621, 251 N.Y.S. 221 (1931); Dawson v. National Life Ins. Co. of United States, 176 Iowa 362, 157 N.W. 929 (1916).; McCord v. Martin, 47 Cal.App. 89, 191 P. 89 (1920); Keely v. Black, 91 N.J.Eq. 520, 111 A. 22 (= court of last resort = 1920); Dunnett v. Arn, 71 F.2d 912 (10th Cir., 1934), on subsequent appeal, Roby v. Dunnett, 88 F.2d 68 (10th Cir. 1937, cert. den. 301 U.S. 706, 57 S.Ct. 940, 81 L.Ed. 1360); Tryon v. Smith, 191 Or. 172, 229 P.2d 251 (1951).

To be a mutual company, it seems to us, all shareholders must have the right of equal opportunity to participate ratably in a sale of stock pursuant to an offer to purchase controlling shares at a favorable price. Otherwise stated, when a controlling shareholder sells his shares every other shareholder is entitled to have an

---

9. For example, see Defs. Ex. 1, Ex. I thereof, p. 173 which shows that Texas Capital Corporation in offering its last issue of one million shares offered 977,- 000 shares to the public at $7.75 per share but offered 23,000 shares to designated or favored persons at the lesser price of $7.3625 per share.

equal opportunity to sell his shares, or a pro rata part of them, on substantially the same terms. Stated more broadly, any offer to buy, whether from a controlling or majority shareholder or otherwise, must be made equally or proportionately to all shareholders. This is simply a guarantee of equality among shareholders in the relation to the market for the corporation's shares.

Still another mode of continuing control over each of the three appellee corporations in addition to a sale of the majority shares exists under the by-laws of each of appellees whereby that share control may be continued as an actual effective operating control. The by-laws of each of the three appellees provide that vacancies in the board of directors between meetings of the shareholders may be filled by the majority of the remaining directors.

Dividends are payable by each of appellees only at the discretion of its Board of Directors.

Each of appellees was chartered under the Texas Business Corporation Act as a Small Business Investment Company to operate under the Federal law and the rules and regulations of the Small Business Administration. We find nothing in these charters or in any of these statutes or authorities which impart any aspect of mutality to any of appellees relative to their obligation to pay dividends to their shareholders.

None of the appellee companies have paid out earnings that they have accrued, on a quarterly or annual or any other regular basis, to the shareholders, of the corporations either as dividends or in any other form. The shares of appellees are not cumulative. This means that the shareholders' claims for dividends or distribution of earnings for all the past years and for all the periods of time in controversy in this suit, have expired and cannot be asserted at a later date. This is the general law. Wabash Railway Company v. Barclay, 280 U.S. 197, 50 S.Ct. 106, 74 L.Ed. 368 (1930).

It is true that a shareholder of a domestic corporation dissenting from certain corporate actions may demand payment of the fair value of his shares. See Secs. 5.11, 5.12 and 5.13, Business Corporation Act, Vol. 3A, V.A.C.S. These provisions, while helpful, do not equate minority and majority shareholders. They prohibit minority holders from sharing in any premium received by the majority shareholders by taking the action from which a dissent is made. Further, sales of shares by the majority is not a matter for dissent under the statutes. See Application of Marcus, 273 App.Div. 725, 79 N.Y.S.2d 76, aff. 303 N.Y. 711, 103 N.E.2d 338.

We believe that the requisite element of mutuality is lacking in the organization of each appellee for the reason that under their charters and by-laws the following actions, inconsistent with any idea of mutuality, may occur:

(1) Each shareholder may sell his own shares for what he can get for them and any premium he may receive for majority or controlling shares he keeps for himself;

(2) Any influence or control exerted by a group which owns a majority or controlling interest may affect adversely the share value of the minority shares and may enhance the share value of the majority shares at the expense of the minority;

(3) A dissenting minority group of shareholders may have to go into court and have the court determine the value of their shares instead of just dividing the total worth of the company between the total number of shares outstanding, as in an open end corporation;

(4) By reason of the exclusion of preemptive rights a favorite shareholder or shareholders, or even outsiders,

may receive additional shares in the company to the exclusion of the existing shareholders and thereby dilute the asset or surplus value of those not receiving additional shares and in addition impairing or completely disfranchising the voting strength of those shareholders not receiving additional shares;

(5) Within the sole discretion of the directors strangers to the company may acquire shares by pre-emption and adversely affect both the per share value and per share voting strength of the existing shareholders;

(6) Directors of the company may withhold payment of earnings as dividends and thus force a compulsory reinvestment of capital of the shareholders;

(7) Directors of the company may withhold payment of earnings as dividends and thus force a distribution of earnings as either dividends or in other form to persons who were not shareholders at the time such earnings accrued;

(8) By reason of large blocks or controlling blocks of shares ownership interest may be emphasized on the basis of the value of particular blocks or shares rather than upon the value of the total shares or value of the company as distinguished from the proportionate value of the particular shares relative to the overall value of either the total number of shares outstanding or the total asset value of the corporation.

Texas Capital was notified by the Comptroller on June 22, 1961, that it occupied an exempt status under Art. 12.03. On July 10, 1961, the Comptroller, having had his ruling challenged by the office of the Secretary of State, addressed an inquiry to the Securities and Exchange Commission in Washington D. C. and received a reply dated July 20, 1961, from which we quote:

"Texas Capital Corporation is an investment company registered under the Investment Company Act of 1940, and its business is holding stock, bonds or other securities of other companies.

The term 'mutual investment company' is nowhere defined or even used in the Investment Company Act. The term 'investment company' is defined and Texas Capital Corporation is an investment company under that definition.

The investment company industry commonly uses the term 'mutual fund' to describe an investment company which constantly redeems its shares at current net asset value. Such a company is defined by the Investment Company Act as an 'open-end investment company.' (See Section 5(a) of the Investment Company Act of 1940). Texas Capital Corporation is not an open-end investment company since it does not constantly redeem its shares, and is therefore classified as a 'closed-end' investment company. It must be emphasized however that the terms 'mutual' or 'mutual fund' are nowhere used in the Investment Company Act.

It may also be of interest that the Internal Revenue Act of 1936 used the term 'mutual investment trust' and defined said term in Section 48. That definition included only companies whose securities were redeemable (open-end investment companies). Since that time the Internal Revenue Code has been changed and the term 'registered investment company' is used. This term includes both open- and closed-end companies. (See Subchapter M, Internal Revenue Code of 1954)."

On July 31st 1961, a memorandum in the Comptroller's office was made, reading:

"I feel that the information supplied by the Securities and Exchange Commission

on July 20, 1961, clearly indicates that the subject corporation is subject to franchise tax and is not covered by that provision of Article 12.03 that deals with Mutual Investment Companies. I would say that there are two qualifications that a corporation must meet under this exemption. First, it must be a mutual investment company. Secondly, it must be registered under the Federal Investment Company Acts of 1940. Since the generally accepted term of mutual investment company is an open-end investment company, I feel that we can successfully defend the position that the Legislature intended. Mutual investment company to have its generally accepted meaning."

In answering a similar inquiry by the Comptroller concerning Electro-Science, the S.E.C. responded and said, in part:[10]

"A closed-end investment company may also fall within the definition of a 'mutual investment company' since the ownership of a share of stock in such a company is an interest in the portfolio holdings of the company in proportion to his stock ownership of the company."

Appellees say that the Comptroller in reversing his ruling as to their exempt status misinterpreted one S.E.C. letter and ignored the other. Whatever merit there may be in this assertion by appellees, we are not bound by the mistake, if any, of the Comptroller or the opinion of the S.E.C. as to the case before us.

■ Appellees argue that had the Legislature intended to exclude "closed end investment" companies, such as appellees,[11] from the exemption declared it Art. 12.03 it would have done so by express language. If the Legislature expressly provided for every contingency which might arise under any state of facts in enacting legislation there would never be any occasion for statutory construction. Unfortunately, this is not done, nor is it possible.

■ Appellees also contend that the term "mutual investment company in the context of the entire statute includes both open-end and closed-end investment companies. Also, that to adopt appellants' construction of the statute would make the subject, a "mutual investment company" more restrictive than the modifying phrases. We fail to follow the logic of this argument. If a statute provides that a white house with a chimney and a red picket fence is entitled to certain rights, would brown and green houses having chimneys and red picket fences also be included? It is our duty to give effect to all words used by the Legislature. We have attempted to discover what was intended by the use of the word "mutual" in Art. 12.03.

Appellees call attention to the fact that the Federal Investment Company Act of 1940 (15 U.S.C.A. Sec. 80a–1 et seq.) does not use the term "mutual investment company." In fact, the term "mutual" is not

10. In House Report No. 2337 of the 89th Congress, 2d Session, entitled "Public Policy Implications of Investment Company Growth," the chairman of the U.S. Securities and Exchange Commission, Hon. Manuel F. Cohen, makes the following statement in his letter of transmittal to the President of the Senate and the Speaker of the House of Representatives, at page VII:
"This report initially describes the dramatic growth of the investment company industry since 1940, with particular emphasis upon mutual funds; i. e., those investment companies which continuously offer new shares to the public and continuously stand ready to redeem their existing shares at net asset value."
At page 43, the following statement appears: "Open-end investment companies are commonly referred to as 'mutual funds.' Indeed this term has become a synonym for open-end investment companies."

11. Each appellee has acknowledged that it has neither redeemed nor offered to redeem any of its shares at any time.

to be found in it. Appellees say, "This fact clearly refutes the appellant's argument that the term mutual investment company should be given a special meaning." The logic of this argument escapes us. There is nothing in the Federal Investment Act of 1940 which bears on our problem. The provisions of the Act are so worded that it is convincingly clear that whether an investment company is mutual or some other type of investment company is immaterial.

We quote extensively from an article entitled "The regulation of the Investment Company Act of 1940 of Small Business Investment Companies Established under the Small Business Investment Act" in the Minnesota Law Review, Vol. 46, p. 143, 157–159 (1961) which has been of great assistance to us and the statements in which have been utilized throughout this opinion:

"The regulatory provisions of the 1940 act were directed particularly at the mutual fund type investment company which was prevalent in 1940. As a result, it has been contended that SBICs should be exempt from the 1940 act since they differ so completely from the mutual fund type investment company. In fact, Wendell B. Barnes, former administrator of the Small Business Administration, has asserted that the question of the applicability of the 1940 Act to SBICs would never have arisen had they not been called 'investment companies.'

Upon examination it becames clear that substantial differences do exist between the SBIC and the mutual fund company. For example, the mutual fund company was formed so that small investors might pool their funds and thereby gain the advantages of diversified investments and expert portfolio management. These companies traditionally invest in the conservative marketable securities of large corporations. Thus, such companies are able to satisfy the small investor who, because of his limited resources, desires safe investments with a uniform rate of return. On the other hand, SBICs are formed primarily to aid small businesses by furnishing these concerns with venture and expansion capital through the purchase of their securities. These securities are typically unlisted. In addition, they are not readily marketable because they represent investments in small business and often are extremely speculative and risky. Thus, the primary purposes and the investment policies of each of these companies are substantially different. A second major difference between these two types of investment companies is in the type of investor they attract. The mutual fund type company tends to attract the inexperienced investor who because of his lack of investment knowledge desires to place his funds in the hands of an expert manager. In contrast, the speculative nature of SBIC investments tends to attract the knowledgeable investor with large resources who seeks the speculative but potentially large profits and the tax advantages afforded the SBIC investor. In addition, the SBIC and mutual fund company differ in their methods of investing funds. The SBIC deals personally with the individual small business in negotiating financial arrangements whereas the mutual fund company makes its investments by purchasing securities of publicly held corporations on the open market. Although the differences between the two types of investment companies are substantial, it would be inaccurate to say that it is impossible for the 1940 act to regulate both types of companies effectively. However, these differences should arouse doubt as to whether the 1940 act can effectively protect investors and still promote the policies of the SBIC."

It is to be noted that each appellee was chartered for the purpose of operating as a Small Business Investment Company.

Appellees analyze the emergency clause of Art. 12.03 and their compliance with it as follows:

## "EMERGENCY CLAUSE

declares that the Legislature was concerned by:

(1) 'The fact that the sole source of income of such mutual investment companies is from receipts of dividends or interest on stocks, bonds, or other securities of other corporations held solely for investment purposes.

(2) The fact that such other corporations already are subject to and pay franchise tax.

(3) That the subjection of such mutual investment companies to a franchise tax in effect taxes the same source twice.

(4) The fact that mutual investment companies doing business in many other States are granted exemptions from franchise taxes whereas mutual investment companies doing business in the State of Texas are not exempt from franchise taxes, thereby placing the latter companies at an unfair disadvantage with respect to selling its shares to Texas investors.

(5) That such mutual investment companies should be entitled to do business in Texas.

## FACTS ESTABLISHED

in the case at bar established that:

(1) Appellees, to the same extent as open-end investment companies, derive their income from the receipt of dividends or interest on stocks, bonds, or other securities of other corporations held by Appellees solely for investment purposes.

(2) The corporations in which the Appellees invest and from which they derive their income are subject to and pay franchise taxes to the State of Texas or some other state.

(3) Subjecting the Appellees to the payment of franchise taxes (denying the exemption) is, in effect, taxing the same source twice.

(4) Corporations similar to Appellees doing business in many other states are exempt from the payment of franchise taxes, placing Appellees at a disadvantage in selling their shares to Texas residents if the exemption is denied. States exempting open-end investment companies exempt closed-end investment companies, without exception, under the same statute.

(5) Appellants admit that to date only five (5) Texas companies have been afforded exempt status since 1951."

———————◆———————

Upon the basis of this analysis, appellees contend that to serve the intent of the Legislative as expressed in the emergency clause they must be considered as "mutual investment companies."

This intent, appellees state, is: "The above-quoted clause unequivocally states that the object of the Legislature was to encourage these mutual investment companies to do business in Texas by removing the unfair disadvantages of double taxa-

tion, an object which is equally applicable to both open-end and closed-end investment companies."

We also quote from appellees' argument (Brief p. 25–6) supporting the "Facts Established" which we have copied above:

"There is an abundance of evidence to support each implied finding of fact in support of the trial court judgment. The Appellants agree that the evidence is generally undisputed (Appellants'

Brief, p. 4). This evidence supports the trial judge's finding that the Appellee corporations met all of the characteristics of a mutual investment company suggested by Article 12.03 and the emergency clause accompanying the passage of the 1951 amendment into law, at least to the same extent as an open-end investment company. Included among these findings was that the double taxation rationale of the statute was as applicable to the Appellees as to open-end investment companies; that the Appellees were registered under the Federal Investment Company Act of 1940; that the Appellees held stocks, bonds, or other securities of other corporations solely for mutual investment purposes; that the income of Appellees is derived from dividends or interest from securities of other companies at least to the same extent as that of open-end investment companies; that those states exempting open-end investment companies also exempt closed-end investment companies without exception; and that therefore Appellees would be placed at an unfair disadvantage in selling their shares to Texas investors should the exemption be denied the Appellees.

The foregoing facts are largely undisputed and are established by the great preponderance of evidence introduced at the trial. The evidence clearly establishes that the nature of the Appellees' business is the same as that of those open-end investment companies which have been granted the exemption, insofar as relevant.

The witnesses, Lamar Ozley and Clifford J. Osborn, both qualified as experts and gave the opinion that Appellees are all mutual investment companies. Therefore, the record adequately supports the trial court in the implied findings to that effect."

This is the extent of their argument and reference to the record to sustain the "Facts Established."

The record references given to sustain "Facts Established" (4) are excerpts from the laws of California, Minnesota, Colorado, Delaware, Oklahoma, Tennessee, Arkansas, New York and New Jersey. All of these statutory excerpts have been examined and they do not support the facts recited in (4). Since Appellees do not analyze or quote from these statutes, we refrain from burdening the record by copying or quoting from them. Suffice to say that none of the excepted statutes mentions "mutual investment companies." We quote from Appellants' Reply Brief in this respect:

"We have examined the laws of all other 49 states and we find no state which exempts or even mentions mutual investment companies in the context of their being exempt from or receiving favorable treatment under its franchise tax or other similar corporate tax laws. We do find several states which extend favorable tax treatment to regulate investment companies as defined under the Federal Income Tax laws. * * *

Our investigation of the laws of the other 49 states in this respect reveal that eight other states do extend favored treatment under their franchise tax, or other similar corporate taxing statutes to regulate investment companies, as defined under the present Federal Income Tax laws." [12]

With respect to "Facts Established" (2) and (3) the record shows that some of the portfolio companies of appellees have paid franchise taxes or license fees to the states of their incorporation.[13] In the States of Nevada, Colorado and New York, for example, an annual registration or license fee is charged. In Nevada this fee is $10.00.

12. These states are Michigan, Minnesota, Misssouri, North Carolina, Oregon, Pennsylvania and Rhode Island.

13. These states are Arkansas, California, Colorado, Minnesota, New Jersey, New York, Nevada, Oklahoma and Tennessee.

Appellees did not show that any of the securities of portfolio companies which they held were subject to these taxes or fees.

Appellees' evidence of the payment of franchise taxes by their portfolio companies fails to show that any of the shares of stock of those companies, as distinguished from the privilege of the corporations themselves, were subject to any kind of tax or fee. No showing was made as to what properties of the portfolio companies were taxed nor the rate or amount of taxes paid by them.

If an investment company pays franchise taxes on its capitalization which is invested in securities forming the taxable capital of another corporation paying a franchise tax thereon, then, in a sense, the same source is taxed twice.

■■■■ There is a distinction, however, which we believe is fundamental. This distinction separates shareholders from the corporation. The corporate property belongs to the corporation, not to the shareholders whose rights are equitable only. 14 Tex.Jur.2d 126, Corporations, Sec. 11. Appellees are mere shareholders in their portfolio companies and they own no interest as such in the assets of the portfolio companies. In no event could there be double taxation here because Texas has not levied a tax on the same property twice. See authorities cited in Words and Phrases, Vol. 13, p. 568 et seq.

It is our opinion that appellees have not shown as sufficient basis for its "Facts Established" Nos. (2) and (3).

We believe that "Facts Established" (5) is not controlling. "Facts Established" (1) will be discussed later in this opinion.

Appellants' points three and four are the trial court erred in holding that appellees were mutual investment companies because the license of appellees as small business investment companies and their investments and because their modes of operation preclude such holding.

"The Small Business Investment Act of 1958 enacted by the 85th Congress, established an entirely new type of investment company licensed by the Small Business Administration (SBA) and regulated by that agency. In brief, the new act authorizes SBA to license privately-owned investment companies whose sole purpose is to invest money in companies qualifying as small business concerns under the definitions issued by that agency for the purpose of making equity capital investments and long-term loans." The Small Business Investment Act of 1958, by Andrew P. Murphy, Jr. and Charles H. Natter, Federal Bar Journal, Vol. 19, No. 2, April, 1959.[14]

At the time of the 1951 amendment of Article 12.03 the Small Business Investment Company was unknown. The bill which Congress enacted in 1958 was designed to meet a specific need with a specific remedy. A new type of company was to be chartered under either State or Federal law and subject to regulation by the Small Business Administration. These companies would be supported by Federal funds and would provide debt and equity financing to small business concerns as well as advisory, management and consulting services.

Each of appellees was organized after enactment of the Small Business Investment Company Act of 1958 and each was chartered for the specific purposes authorized by that Act.

Illustrative of the manifest intentions of each of the appellees is a statement on the first page of the Registration Statement dated September 7, 1960 of Appellee Electro-Science Industries, Inc. filed with the U. S. Securities and Exchange Commission.

"The registrant has been organized expressly for the purpose of operating under the Small Business Investment Act of 1958, as amended, (the 'Act') and will operate in the manner and have the power and

14. The Small Business Investment Act of 1958 is Pub.L. 85–699, Aug. 21, 1958, 72 Stat. 689.

responsibilities and be subject to the limitations, provided by the Act and the regulations issued by the Small Business Administration (the 'SBA') * * *"

Likewise, Appellee Texas Capital Corporation has indicated the organizational basis for its existence in its Prospectus dated September 14, 1961 as filed with the U. S. Securities and Exchange Commission.

"Principal Aims and Objectives

Congressional studies have indicated that in order to obtain funds needed by small business concerns for the sound financing of their business operations and their growth, expansion and modernization, such concerns require long-term loan funds and equity capital which are frequently not available from banks or private venture capital. To make such funds available from private financing sources, Congress in 1958 enacted The Small Business Investment Act in order to provide a vehicle and set forth a program to stimulate and supplement the flow of private equity capital and long-term funds to such concerns through federally-licensed small business investment companies such as Texas Capital Corporation. * * *"

Similarly, Appellee Capital Southwest Corporation stated the exclusive purpose of its organization and operation in its Registration Statement filed with the Securities and Exchange Commission on July 12, 1961 as follows:

"(c) The registrant has been organized expressly for the purpose of operating under the Small Business Investment Act of 1958, as amended (the 'Act'), and will operate in the manner and have the power and responsibilities and be subject to the limitations provided by the Act and the regulations issued by the Small Business Administration (The 'SBA'). * * *"

▉ The Legislature could hardly have contemplated the exemption of a distinctive and specially-created type of company which was not even a possibility until nearly six years after the exemption statute was enacted. The license of each of appellees limits its operations to those of a type which was unknown at the time of enactment of Article 12.03. The Texas Legislature could not delegate to Congress or the Small Business Administration the power to declare the nature or requisites of a mutual investment company.

The Small Business Investment Act of 1958 contains the following provision in Section 305(a). "Each company is authorized to make loans, in the manner and subject to the conditions described in this section, to incorporated and unincorporated small-business concerns in order to provide such concerns with funds needed for sound financing, growth, modernization, and expansion."

The Prospectus of Appellee Texas Capital Corporation, dated September 14, 1961, and filed with the U. S. Securities and Exchange Commission, contains the following statements:

"BUSINESS AND METHODS OF OPERATION * * *

The Company has ascertained in its operation so far that there are instances in which small business concerns are not corporations but, nevertheless, are worthy of receiving credit, and in two instances loans have been made thereto.

The Company will also make long-term loans to small business concerns, both incorporated and unincorporated. * *"

Counsel for Appellee Texas Capital Corporation pointed out to the trial court that it is perfectly legal for an SBIC to make an investment in an unincorporated business under Sec. 305 of the SBI Act of 1958 and that Appellee Texas Capital had, in fact, done so.

If the income of appellees includes interest on loans to unincorporated businesses this income would not be from other in-

corporations as we construe Art. 12.03 to require. Also, since unincorporated businesses pay no franchise tax the purpose for which the exemption was included in Art. 12.03 would fail.

We do not believe that the securities held by appellees are characteristic of those commonly held by mutual investment companies. Certainly, they are not typical within the discussion in the Minnesota Law Review which we have quoted.

The Prospectus of Appellee Texas Capital Corporation dated September 14, 1961, and filed with the U. S. Securities and Exchange Commission, contains the following statements:

"* * * It is not necessarily the company's policy to concentrate its investments in any particular industry, but it proposes to diversify its investments in small business concerns, which operate primarily in the State of Texas. Some of these concerns may be new and speculative companies, which in the judgment of management have growth potential, but such growth cannot be assured. * * *

There will be in most cases no market for the Company's portfolio securities, making it difficult to sell these securities until such time as the small business concerns in which the Company invests may develop to the point where a market is created for their securities. Until such market may develop it will be necessary for the Board of Directors to establish values for these portfolio securities."

The Prospectus of Appellee Electro-Science Investors, Inc. dated October 27, 1960, and filed with the U. S. Securities and Exchange Commission contains the following statements:

"Initially at least only a limited or no market will exist for the Company's portfolio securities. Consequently, such securities will not be readily salable until a market has developed and until such

time as the Board of Directors may establish carrying values for the Company's portfolio securities based on such factors as book value, earnings, and its estimated prospects.

The companies in which the Company will invest will be small and subject to abnormal risks due to such factors as size, competition, responsiveness to general economic conditions, rapidly evolving technology and changes in military programs. * * *"

The Vice-President of Appellee Texas Capital Corporation described the companies in which they invest as "small" and "with a great deal of risk inherent in it." He described the portfolio of Texas Capital as "speculative to a degree."

The former President of Appellee Capital Southwest Corporation described the portfolio of securities of Capital Southwest as "high-risk."

The former President of Appellee Capital Southwest Corporation testified that the term "mutual funds" is the only instance in the securities market generally where the term "mutual" is used frequently. He further testified that SBIC's are "mutual investment companies" because the stockholders have a mutual interest in the investments which the company makes.

With respect to the rights of shareholders in Texas Capital Corporation, its Vice-President testified that its shareholders do not have any rights to acquire the underlying assets of the corporation; that they do not have the right to withdraw dividends or stock options received by the corporation; that they have no voting rights in the portfolio corporations; that they have, in fact, no rights other than those which any corporate shareholder would have in the assets of a usual kind of corporation, other than his rights to receive distributions of income before income tax.

These statements are also applicable to the other appellees.

Each of the appellees is denominated or controlled by a small group of large shareholders. For example, the following number of shareholders own more than five thousand shares of stock, representing the percentages indicated:

|  | (a) Total Shares | (b) No. of Shareholders Owning 5000 or more | (c) Percent of Total Owned by (b) |
|---|---|---|---|
| Texas Capital | 1,535,300 | 33 | 26% |
| Capital Southwest | 1,495,000 | 31 | 55.57% |

As to Electro-Science Investors, Inc., four (4) of its stockholders who were also its officers and directors owned 34.8% of its shares.

All of appellees were organized by very large, highbracket shareholders. Illustrative of the pattern is this excerpt from the Prospectus of Appellee, Capital Southwest Corporation:

"Capital Southwest Corporation (the 'Company') was founded through the cooperative efforts of a group including the executive officers and directors of approximately 20 banks located in the Southwest. All of these banks invested in the stock of the Company and all but one have invested * * * the maximum amount permitted by law. * * *"

Referring again to the Minnesota Law Review Article previously quoted it is manifest that appellees do not conform to the mutual type of corporations since they are controlled by large shareholders and since their shareholders do not have any right to acquire their proportionate share of the assets of the corporations.

Each of appellees has represented in statements filed with the Securities and Exchange Commission that its business would be to:

"To supply financial, management and advisory services on a fee basis to the small business in which it has an investment; * * *" (Electro-Science)

"To supply management, financial and advisory services on a fee basis to small businesses, primarily those in which the Company has invested." (Capital Southwest)

"To provide management and financial counseling and other technical services on a fee basis for small business concerns which do not have such staff services available." (Texas Capital)

Each of appellees has rendered the type of services which they represented they would perform. The following tables reflect some, but not all, of the fees for services rendered by appellees:

|  | Electro-Science Investors, Inc. | Texas Capital | Capital Southwest |
|---|---|---|---|
| 1960 | $ –0– | $ –0– | $ –0– |
| 1961 | 1,894.20 | 8,260.00 | –0– |
| 1962 | 3,910.50 | 15,760.00 | –0– |
| 1963 | 1,689.50 | 15,760.00 | 2,308.00 |
| 1964 | 1,472.30 | 17,812.00 | 475.00 |
| 1965 | 5,114.30 | 22,427.00 | 24,300.00 |
| 1966 | 7,575.00 | 27,966.00 | 24,050.00 |
| 1967 | 8,675.00 | 19,318.00 | 11,400.00 |

These fees do not constitute "interest or dividends on stocks, bonds or other securities of corporations" as stated in Art. 12.03.

We do not believe that the Legislature intended to exempt from the franchise tax some corporations engaged in the business activities above noted while taxing others similarly engaged.

Another source of income which has been realized by appellees is that of closing fees and commitment fees. These fees have been reported as additional interest. Appellee Texas Capital received, in a single transaction, a $1,000 appraisal and management fee and a $15,000 closing fee. A commitment fee aggregating $62,600 was realized from Public Radio Corporation by Appellee Texas Capital Corporation for a pledge at a bank. Appellee Texas Capital also received a management and initiation fee of $43,000 which was prepaid out of loan proceeds by Luke Parkway Development, Inc. Appellee Capital Southwest Corporation charges a commitment fee of 1% of the proceeds of any loans made.

These fees are related to but are not derived directly from the use of money. In our opinion these receipts are not interest and do not fall within the provisions of Art. 12.03.

There is another type of income which the record shows appellees to have received, i. e., stock options.

Appellee Texas Capital Corporations' accountant testified that there had been stock options acquired for no costs and that such options were not recorded on the books of the corporation at the time because of the uncertainty of their market value. He further testified that substantial values had been received which were unrecorded.

Appellee Texas Capital officers testified as to these specific options acquired: Big D Communications, Inc. (a portion of 905,166 shares); Rio Rojo Gathering System (2000 shares); Airborn, Incorporated (63,999 shares); Rio Sabine, Inc. (2000 shares); Gas Industries (510 shares); Petroleum Capital Company, Inc. (150 shares); Keystone Value Corporation (34,-052 shares); Big D Outdoor, Inc. (2000 shares); Telesystems Corporation (25,000 shares); Southwestern Superior Products Corporation (135,000 shares); Ramo, Incorporated (300,000 shares). Also Texas Capital's accountant testified as to stock options from Arnold Pipe Rental Company, Inc.; Luke Parkway Development, Inc. (option for 50% of stock); American Homebuilders (17,600 shares); U-Tote-M of Arkansas (150,000 shares)—27% of outstanding stock and Wolff & Marx (10,000 shares).

An Appellee Electro-Science official testified as to stock options received by the corporation in connection with loans made: Columbia Industries, Inc. (2500 shares) and General Electronics Control (175,000 shares). He stated that the corporation received stock options in about fifteen percent of the transactions in which it participated.

The method of operations of each of appellees is revealed in the pattern of acquisitions through stock options and commissions. It is significant to note that out of 59 loans made by Appellee Texas Capital that in 31 of them stock interests have been acquired. That out of 40 loans made by Appellee Electro-Science Investors that in 22 of them stock interests were acquired. And, that as to Appellee Capital Southwest Corporation that 40 of the 55 borrowers are partially owned by that appellee through stock interests acquired in the borrowing corporation.

It is clear that one of the principal business objectives of each of appellees is to realize income through the stock options and conversions which they have received. This is not, in any sense, income from interest and dividends. It is not the business of a mutual investment company. It is the business of that highly specialized and speculative type of loan company known as the SBIC.

Appellees have been in position to dominate or control many of the companies which they have financed. For example, Appellee Texas Capital Corporation owned 6 out of 31 corporations 100%; 4 corporations from 75–100%; 6 corporations from 50–74%; and 7 corporations from 30% to 49%. Appellee Capital Southwest Corporation owns 17 out of 40 corporations by more that 30%, including 1 by 100%; 1 by 98%; 2 by 88%; 2 by 80% and 1 by 50%. Appellee Electro-Science Investors owns very large shareholdings in many of its portfolio companies.

In addition to the very large stock ownership by appellees in most of their portfolio companies, appellees have elected Directors to serve on the Boards of most of them. In many instances, the combination of large stockholdings and Board representation has provided appellees with the power to operate and control the portfolio companies in the same manner as a holding company. The former President of Appellee Capital Southwest Corporation testified that the primary difference between a holding company and an investment company is the intent of the former to control the operations of the companies it owns. In the case of Appellee Texas Capital Corporation there is substantial evidence to indicate that it did in fact control and operate many of its portfolio companies.

The two basic essentials to a holding company control of its subsidiary corporations are characteristic of the appellees; namely, controlling or dominant stock ownership, and interlocking directorates.

The Texas statute contemplates only that a mutual investment company shall manage the monies of its members by investing such monies in stocks, bonds or other securities of other companies solely for mutual investment purposes. The Texas Act clearly does not authorize such an exempt corporation to manage any aspect of the business or the business affairs or the internal affairs of any company in which it invests monies of its members. Nor does the Texas Act contemplate that such mutual investment company shall have business dealings with those companies in which it invests its monies other than such as are necessarily incident to the investment of such monies.

It seems to us that these facts tend to show that appellees more closely resemble holding companies rather than a mutual investment company which Art. 12.03 exempted from payment of franchise taxes.

The Investment Company Act of 1940 defines control as follows:

"'Control' means the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company.

Any person who owns beneficially, either directly or through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such company. * * *" 15 U.S.C.A. Sec. 80a–2(9)

"Person" is defined in this Act of 1940 as a natural person or a company. 15 U.S.C.A. Sec. 80a–2.

We believe it clear from this record that appellees have the power to exercise controlling influence over the management and policies of companies whose securities it had purchased, and that these powers are not consistent with the type of company which the Legislature in Art. 12.03 selected for a tax exemption status.

Electro-Science did not file a formal election to be treated as a Regulated Investment Company under the Internal Revenue Act; however, a witness testified that from October 1960 to August 1967 it could have filed such election. Capital Southwest qualified for this status in 1968, and Texas Capital since 1960.

These facts are stated with reference to Art. 12.03, wherein one of the reasons

given for exempting mutual investment companies from the franchise was that the Federal Government exempts from income taxes their income which is distributed to shareholders.

If the purport of appellees' "Facts Established" (4) is that the sole source of their income is from the receipt of dividends or interest on stock, bonds, or other securities of other corporations held by them solely for investment purposes then it is not supported by the evidence, which as hereinabove set out is to the contrary. If this is not the purport of such "Established Fact," then it is irrelevant.

There is testimony in the record from Mr. Clifford Osborn who was an officer of Capital Southwest from its inception until February 1968, that in his opinion appellees were mutual investment companies. We believe that the contrary is established as a matter of law from undisputed evidence and that the opinions expressed by Mr. Osborn constitute no more than a scintilla of evidence which is insufficient to raise an issue of fact. We reach this conclusion having in mind the following testimony of Mr. Osborn:

"Q Mr. Osborn, I believe you have testified that in your opinion Capital Southwest, Texas Capital and Electro-Science Investors are mutual investment companies, is that correct?

A Right.

Q Are all S.B.I.C.'s mutual investment companies?

A Basically, I would say yes they are because the stockholders have a mutual interest in the investments that the company makes, the investment companies.

Q So your understanding of the term of 'mutual investment companies' is that the stockholders have a mutual interest in the investments, is that correct?

A I think this is part of it, sure.

Q Is that true of every corporation?

A Are you asking, is it true that the the stockholders have—

Q A mutual interest?

A Sure, they have a prorata interest depending upon the number of shares they own."

We also direct attention to the testimony of Mr. Osborn quoted earlier in this opinion.

It is obvious that Mr. Osborn does not give any significance to the word "mutual."

It is our opinion that the points made by appellants and sustained by us both severally and collectively require that this judgment be reversed and judgment here rendered that appellees take nothing by their suits.

█ Appellees have a counterpoint to the effect that if we hold as we have held then Art. 12.03 would be unconstitutional because it would unreasonably discriminate against them and would violate the due process and equal protection clauses of the Constitutions of the United States and Texas.

We overrule this point.

The discrimination which is said to exist is in not exempting "closed-end" investment companies as appellees are as well as "open-end" investment companies.

█ The Legislature has broad discretion in classifying subjects for tax purposes. Its only restriction is that the classification not be unreasonable or arbitrary. Considering the material differences between these two types of investment companies, as pointed out in this opinion, we do not believe the Legislature acted arbitrarily or unreasonably in exempting from payment of franchise taxes only "open-end" or mutual investment companies.

The judgment of the trial court is reversed and judgment is here rendered that appellees take nothing by their suits.

Reversed and rendered.